UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NYU HOSPITALS CENTER,

      Plaintiffs,

vs.                           CASE NO. 08 cv 6187 (RJS)

THOMAS MOLLO and
BLUE CROSS BLUE SHIELD
OF FLORIDA, INC.

      Defendants.
_____/

### DECLARATION OF SCOTT M. KIRBY

Pursuant to 28 U.S.C. § 1746, Scott M. Kirby, provides the following declaration and states:

1.    I am employed by Blue Cross and Blue Shield of Florida, Inc. ("BCBSF"), in the Legal Affairs Division, as a Senior Legal Affairs Consultant. I have personal knowledge of the matters set forth in this Declaration by virtue of my position, job responsibilities, and access to business records.

2.    I have reviewed the Verified Complaint filed by plaintiff NYU Hospitals Center against Thomas Mollo ("Mollo") and BCBSF. Plaintiff's complaint seeks benefits for hospitalization services allegedly provided to Mollo from January 31, 2007 to February 13, 2007.

3.    A review of BCBSF's records show that Mollo was covered through a Group Health Plan ("the Plan") provided by Brevard Public Schools, Brevard County, Florida. The Plan is self funded by Brevard Public Schools.

4.    BCBSF is the parent company of Health Options, Inc. ("HOI"), a wholly owned subsidiary of BCBSF. HOI is a Health Maintenance Organization ("HMO"), whereas BCBSF is a not-for-profit mutual insurance company, and is not an HMO. Through the Plan, Mollo had enrolled as a member in HOI for dependent coverage through his wife who was employed by the Brevard Public Schools.

5.    A copy of the Summary Plan Description entitled Brevard Public Schools Self-Funded Medical Plan, which became effective January 1, 2007, is attached hereto as Exhibit "1".

6.    BCBSF is the third party administrator for the Plan, and entered into an Administrative Services Agreement ("ASA") with Brevard Public Schools for purposes of the administration of the Plan as those matters are set forth in the ASA. A copy of the ASA effective January 1, 2007, that was in effect at the time of the hospitalization services alleged to be at issue in the complaint, is attached hereto as Exhibit "2".

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25 $^{TH}$ day of July, 2008.

SCOTT M. KIRBY

# 5495904_v1

2

# EXHIBIT 1



BREVARD PUBLIC SCHOOLS

SELF-FUNDED MEDICAL PLAN

SUMMARY PLAN DESCRIPTION

EFFECTIVE JANUARY 1, 2007

This document supersedes any other documentation pertaining to this Plan, including earlier versions of this document.  Materials from Third Party Administrators; and verbal representations, regardless of the source.

EFFECTIVE JANUARY 1, 2007
TABLE OF CONTENTS

Page Number

PART I     ELIGIBILITY, EFFECTIVE DATE OF COVERAGE,          3
           DISCONTINUANCE OF COVERAGE, AND
           EXTENSION OF CERTAIN BENEFITS

PART II    DEFINITIONS                                       11

PART III   SCHEDULE OF BENEFITS                              25

PART IV    COVERAGE PROVISIONS                               29

PART V     EXCLUSIONS AND LIMITATIONS                        35

PART VI    PRE-CERTIFICATION AND UTILIZATION MANAGEMENT      39

PART VII   PRE-EXISTING CONDITIONS                           40

PART VIII  DUPLICATION OF COVERAGE UNDER                     41
           OTHER HEALTH PLANS/PROGRAMS

PART IX    CLAIMS PROCEDURES AND ADMINISTRATION              44

PART X     SUBROGATION RIGHTS                                45

PART XI    AMENDMENTS AND WAIVERS                            46

PART XII   CLERICAL ERROR                                    46

PART XIII  APPLICABLE LAW                                    46

PART XIV   INCONSISTENCY                                     46

PART XV    FRAUD, WASTE, AND ABUSE                           47

PART XVI   GRIEVANCE PROCEDURE                               47

PART XVII  RESPONSIBILITIES FOR PLAN ADMINISTRATION          52

PART XVIII HIPAA PRIVACY NOTICE                              53

           NOTICE TO RETIREES RE MEDICARE PART D             57

           AGREEMENT PAGE                                    60

## PART I

## ELIGIBILITY, EFFECTIVE DATE OF COVERAGE, DISCONTINUANCE OF COVERAGE, AND EXTENSION OF CERTAIN BENEFITS

**I.1    Covered Employment Classification:**

All full-time, regular employees who are in a benefits-eligible position as determined by the District. Full-time is defined as working in excess of twenty-five (25) hours per week. Part-time employees may be covered as authorized by the applicable collective bargaining agreement or administrative regulation.

**I.2    Retirees:**

Employees described above who retired from the Brevard Public Schools and elected to continue health insurance coverage, hereafter referred to as Retirees.

A.    Retirees not eligible for Medicare who maintain continuous coverage will be eligible to participate.

B.    Retirees eligible for Medicare who maintain continuous coverage will be eligible to participate. Medicare shall be the primary payor with respect to a Retiree eligible for Medicare. A Retiree who becomes eligible for Medicare must, (1) enroll in Medicare Parts A and B, (2) provide verification of enrollment in Medicare Parts A and B, and (3) submit a written request to continue coverage on a Medicare Primary Plan, in order to continue coverage under the Plan after such Retiree becomes eligible for Medicare. Retirees cannot be enrolled in Medicare Part D.

**I.3    Benefit Eligibility Date for Employees, Retirees, and Dependents:**

Coverage of an Employee, Retiree, and Dependent will not become effective unless a written request is made on all such coverage in an application form, or through any other designated enrollment process established by Employer, and the Employee or Retiree consents therein to pay any applicable premium.

A.    All Employees and Retirees of the Employer as of the effective date of this Plan shall be eligible for coverage forthwith as they would have been eligible for the previous Plan.

B.    The Benefit Eligibility Date for new Employees will be following the completion of forty-five (45) days of active employment in a covered employment classification with the Employer.

C.    Retirees will have a Benefit Eligibility Date beginning on the first of the month after termination of coverage as an Employee. Coverage for a Retiree will not become effective unless the Retiree makes a written request for such coverage on an

- 3 -

application form, and the Retiree consents to pay any applicable premium. See Section I.2 of the Plan for additional requirements applicable to Retirees. Coverage under the Medicare Primary Plans will become effective on the first of the month in which the Retiree becomes Medicare eligible.

D.  The Benefit Eligibility Date for Dependent Coverage shall coincide with any one of the Enrollment Periods as follows:

   1.  The date of the Covered Employee's or Retiree's eligibility;

   2.  The date the Covered Employee or Retiree acquires a new dependent under the Special Enrollment Period (Change in Family Status);

   3.  The date the Employee's Dependent became eligible under the Special Enrollment Period (Change in Family Status) as defined in Section I.3 Item G;

   4.  The first calendar day of the Plan Year following Employee's written request for Dependent overage under the Late Enrollment Period.

E.  If a husband and wife are both eligible for coverage, the father will carry Primary Coverage with respect to any children they may have.  Employees may not be dependents of each other.

   In order for a husband and wife who are both eligible for coverage hereunder to be eligible for special contribution rates that are available for covered spouses who are also covering one or more dependents, both the husband and wife must be actively at work or on a paid leave.  When a spouse meeting the conditions above goes on an unpaid leave, the couple forfeits the special contribution rates (joint coverage).

F.  One employee may not cover another employee as a dependent unless the employee to be covered as a dependent is employed in a non-benefit position.

G.  Special Enrollment Period

   1.  During the Plan Year, Employees may request coverage for a dependent who is eligible but not currently enrolled when the dependent's Group Coverage ends because of

      - Loss that was initiated by the dependent's Employer
      - Exhaustion of COBRA continuation
      - Loss of Coverage due to termination of employment, or if there is a Change in Family Status because of:
         - Marriage
         - Birth of a child
         - Adoption or placement for adoption
         - Death
         - Divorce

2.   When a Change in Family Status occurs (as defined in Section I.5, item 2), dependent spouses who are otherwise eligible but not currently enrolled, may also enroll in certain circumstances.

3.   Employees must provide written notification, with supporting documentation, within thirty (30) days of the occurrence.

4.   Enrollment is not available if the previous Group Coverage loss resulted from fraudulent activity or because of failure to pay premiums.

H.   Late Enrollment Period

1.   During annual Open Enrollment, Employees may request coverage for dependents that are eligible but not currently enrolled. Eligible dependents' coverage will have a Benefit Eligibility Date of the first day of the following Plan Year. Late Enrollees are not eligible for coverage during the Plan Year. Pre-existing conditions may apply; refer to Part VII of this document.

2.   Retirees in the Medicare Eligible Classification are not eligible for coverage during the Late Enrollment Period.

I.   For Covered Employees with single or Dependent Coverage in force, a newborn child and a newborn adopted child will be covered from birth for any injury, illness, or congenital condition, provided the newborn child or adopted newborn child is enrolled as a Dependent of the employee within thirty (30) days after the date of birth.

1.   If a child is not enrolled within thirty (30) days after the date of birth, coverage for the newborn child will become effective from the date of birth only after payment of any additional premium, from the date of birth. If notice is not given within 60 days, coverage may be denied.

2.   The effective date of coverage for an adoptive child who is not a newborn will be the date the child is placed under the Covered Employee's legal guardianship.

3.   Evidence of good health is not required and no pre-existing conditions apply to Dependent Coverage of a newborn or adopted newborn child.

J.   In no event will Dependent Coverage become effective prior to the Benefit Eligibility Date of the Covered Employee or Retiree.

K.   If a Retiree dies, eligible dependents covered at the time of death may remain members of the health insurance plan. The eligible dependents may continue coverage by making application within thirty (30) days of the event agreeing to pay the applicable premium. Dependents will remain eligible for coverage as long as they meet the definition of dependent.

L.   Covered Employees or Retirees with Dependent Coverage are required to enroll in the same Health Insurance Option. The exceptions to this rule are Retirees who are

- Medicare eligible with dependents who are not Medicare eligible
- Not Medicare eligible with dependents who are Medicare eligible

Retirees and dependents meeting these criteria may enroll in the plan appropriate for them.

## I.4   Discontinuance of Coverage:

A.   Except as provided to the contrary in this subsection, Covered Employee's/Retiree's coverage will cease on the first of the following dates to occur:

1.   The date this Plan is discontinued.

2.   For a Covered Employee, coverage shall end the day on which the Covered Employee ceases to work as an eligible employee, except as the coverage may be deemed to continue in accordance with COBRA conversion.

3.   For a Retiree, coverage shall end the last day of the month ending the last period for which the Covered Retiree made any premium contribution if due.

B.   Except as provided to the contrary in this subsection, a Covered Employee's/Retiree's Dependent Coverage will cease on the first of the following dates:

1.   The day of the month the Covered Employee and Covered Retiree coverage is discontinued.

2.   The day of the month the Covered Employee no longer has an eligible dependent.

3.   The day of the month of the Covered Dependent child's eligibility for personal coverage providing similar benefits.

C.   A Covered Employee's/Retiree's Dependent Coverage with respect to any individual dependent will cease on the date such dependent is no longer a qualified dependent as defined in Part II Section II.20 of this document.  The coverage provisions of his or her policy providing benefits based on expenses incurred for the dependent's medical care and treatment may be continued on a premium-paying basis during the continuance of such status, provided that

1.   Proof that the dependent child, on the first day of the calendar year following the attainment of age 19, meets the dependent child conditions specified in Part II Section II.20 of this document.  Proof of such status must be given to the Employer within thirty (30) days after the date the dependent attains the limiting age.

      2.    The Employer or Third Party Administrator shall have the right at any time during the continuation of coverage under this paragraph to require due proof of the continuance of the incapacity   Part II Section II.20 of this document and to have the dependent examined by designated doctors any time during the first two years of such continuance and not more often than once a year thereafter.

## I.5    Section 125 - Pre-Tax Dollars:

A.    Under the Internal Revenue Service (IRS) Section 125, health coverage premiums may be paid with pre-tax dollars. This means that premiums are deducted from gross income before federal withholding taxes and FICA taxes are deducted. To take advantage of this tax benefit, the IRS requires that plan elections be made on an annual basis, and cannot be changed during the plan year except when certain criteria are met.   These criteria are as follows:

      1.    Cost Changes:  Coverage may be revoked if there is a significant increase in plan cost, but only if the Employee and/or dependents have other coverage.2.   Coverage Changes:  Coverage may be revoked if the Plan is significantly curtailed or ceases during the period of coverage.

      2.    Change in Family Status:  Plan may permit Employees to revoke existing elections in the event of certain family status changes (qualifying events) and make new elections consistent with these changes.  Status changes allowed are:

          a)    Employee's marriage;

          b)    Employee's divorce;

          c)    Death of the Employee's spouse or other dependent;

          d)    Birth or adoption of a child of the Employee;

          e)    Termination or commencement of employment by the Employee's spouse;

          f)    Employee or Employee's spouse switching from part-time to full-time employment, or from full-time to part-time employment;

          g)    Employee or the Employee's spouse taking an unpaid leave of absence greater than 30 days;

          h)    Significant changes in the health coverage of the Employee or of the Employee's spouse attributable to the spouse's employment;

          i)    Any dependent no longer eligible.

NOTE: Employees have 30 days to notify the Plan Sponsor of an Eligible Family Status change, and to change their elections. If notice is given more than 30 days after event occurs which leads to a dependent's ineligibility, premiums must be paid until the end of the Plan Year, even though the dependent is ineligible to receive coverage.

B.    Employees & Retirees are provided with an annual enrollment period during which elections may be changed, added or dropped, without the need for a qualifying event. This period typically takes place in the Fall, and notification is sent to each Employee and participating Retiree. Note: Any changes, additions, or deletions of coverage outside of annual enrollment must be precipitated by a qualifying event (defined above).

## I.6    Continuation of Health Benefit Provision - COBRA:

A.    All Covered Persons are entitled to elect to remain in this Plan after coverage otherwise would expire, as follows:

  1.    The period of continuation of coverage is 36 months for:

      a)    Surviving spouse and dependent children of a deceased Employee;

      b)    Legally separated or divorced spouse and dependent children of a current Covered Employee;

      c)    Dependent children when they cease to be a dependent child under the definition in this Plan;

      d)    Spouse and Dependent children of a Medicare Covered Employee.

  2.    The period of continuation of coverage is 24 months for a Covered Employee on active duty military service.

  3.    The period of continuation of coverage is 18 months for the Employee (and his or her dependents) in case of loss of coverage due to:

      a)    Reduction in work hours;

      b)    Termination (voluntary and involuntary) unless due to gross misconduct.

B.    An Employee or qualified beneficiary who is determined to have been disabled for Social Security purposes within sixty (60) days of the qualifying event and who gives the Third Party Administrator notice and before the end of the eighteen (18) month continuation period may extend the continuation of coverage to twenty-nine (29) months.

C.    The Employer may terminate coverage prior to expiration of the eighteen(18), twenty-four(24), or thirty-six(36), month period, only under the following circumstances:

1. The Employer ceases to provide any group health plan.

2. The Covered Person fails to pay required premium on a timely basis.

3. The Covered Person is covered under another group health plan that does not contain any exclusion or limitation with respect to any pre-existing condition; or the Covered Person is eligible for Medicare.

4. The Covered Person is no longer disabled.

D. The coordination, administration, and any other function with respect to COBRA and Retirees shall be the sole responsibility of the Employer or a Third Party Administrator.

1. With respect to COBRA, the Covered Person will have sixty (60) days following notification by the Employer of the qualifying event to elect coverage and forty-five (45) days after date of election to make applicable premium contribution for continuation of coverage.

2. With respect to Employees on approved leave of absence, and Retirees, the Covered Person must notify the Employer to arrange applicable premium contribution for continuation of coverage.

3. The Employee/Retiree may elect a Conversion policy through the Employer after COBRA time expires.

## I.7    Disability Extension of Benefits:

A. If this policy, or a person's coverage under this Plan, is terminated for any reason while the Covered Person is totally disabled and prevented thereby from engaging in his or her regular occupation, such termination shall be without prejudice to the payment of any claim for charges incurred

1. Due to the condition that caused the total disability and not exceeding one (1) year.

2. Due to a condition for which the Covered Person has an existing claim at the time of such termination provided such charges are incurred prior to the earliest of the following dates:

   a) The end of the three (3) month period following the date coverage terminated;
   b) The date on which he or she ceased to be totally disabled and prevented thereby from engaging in his or her regular occupation; or the date any dependent is prevented from engaging in his or her customary duties and activities;
   c) The date the Covered Person becomes eligible for coverage under any other group medical benefit or service plan.

## 1.8    **Leave of Absence:**

Coverage may be continued for a Covered Employee and eligible dependent(s) while on a leave of absence with full and timely payment of all contributions and premiums due.

## PART II

## DEFINITIONS

Certain words and phrases used in this Summary Plan Description are listed below, along with the definition or explanation of the manner in which the term is used for the purposes of this Plan.

Whenever any words are used herein in the singular or plural, they shall be construed as though they were in the plural or singular, as the case may be, in all cases where they would so apply.

### II.1    Actively at Work:

The active expenditure of time and energy in the service of the Employer. A covered person shall be deemed actively at work on each day of a regular paid vacation, or on a regular non-working day on which he or she is not totally disabled, provided he or she was actively at work on the last preceding regular working day.

### II.2    Alternate Recipient:

Any child of a Covered Person who is recognized under a medical child support order as having a right to enrollment under a group health plan with respect to such participant.

### II.3    Ambulatory Surgical Center:

A legally operated facility that specializes in surgical procedures, has a staff of Doctors of Medicine or Osteopathy, has registered nursing services, does not have facilities for patients to stay overnight, and is accredited by the Accreditation Association for Ambulatory Health Care or meets like standards.

### II.4    Amendment:

A formal document that changes the provisions of the Plan Document and is duly signed by the authorized person or persons as designated by the Plan Administrator.

### II.5    Benefit Eligibility Date:

The first day that Covered Employees, Retirees and Dependents are eligible to access benefits and have benefits paid under the health plan.

### II.6    Benefit Period:

A time period of one Plan Year commencing January 1 and ending December 31 of each year. Such benefit period will terminate on the earliest of the following dates:

A.    The last day of the Plan Year or

B.    The day the Maximum Lifetime Benefit and/or other limited benefits applicable to the Covered Person reaches maximum.

## II.7    Birthing Center:

Any health facility, place, professional office, or institution that is not a hospital or in a hospital, and where births are planned to occur away from the mother's usual place of residence following normal, uncomplicated pregnancy. This facility must be licensed and operated in accordance with the laws pertaining to birthing centers in the jurisdiction where such facility is located. Such an institution must

A.    Provide facilities only for obstetrical delivery and short-term recovery after delivery (no more than 6-10 hours of recovery);
B.    Provide care under the full-time supervision of a legally-qualified physician and a Registered Nurse or a Certified Nurse Midwife; and
C.    Have a written agreement with a Hospital, as herein defined, in the same locality for immediate acceptance of patients who develop complications or require post-delivery confinement.

## II.8    Calendar Year:

January 1 through December 31.

## II.9    Cause:

Any and all medical conditions resulting from or related to a common injury or illness, even if these conditions manifest themselves at different times.

## II.10    Child:

The natural child, stepchild, or legally adopted child of the covered employee or retiree or has been placed under the legal guardianship of the covered employee or retiree.

## II.11    COBRA:

The rights of continuance of coverage under federal legislation initially passed under the Consolidated Omnibus Budget Reconciliation Act of 1986, and as described in the Schedule of Benefits.

## II.12    Coinsurance:

That portion of eligible expenses to be paid by this Plan in accordance with the coverage provisions as stated in the Schedule of Benefits.

## II.13    College or University:

An institution accredited in the current publication of accredited institutions of higher education.

**II.14  Co-Payment:**

The charge for health care services that a Covered Person must pay as a condition to receive services.

**II.15  Covered Medical Expenses:**

Any medically necessary treatments, services, or supplies that are not specifically excluded from coverage elsewhere in this Plan and not in excess of Plan limitations.

**II.16  Covered Facility:**

A Hospital, Skilled Nursing Facility, Ambulatory Surgical Center, Home Health Agency, Birthing Center, or legally operated facility (or special part of a facility) that specializes in Mental or Physical Disorder Treatment Programs.

**II.17  Covered Person:**

Any Employee, Retiree, or Dependent of an Employee meeting the eligibility requirements for coverage as specified in this Plan, and properly enrolled in the Plan. When the Employer employs both husband and wife, any dependent child may become covered only as a dependent of the covered father.

**II.18  Custodial Care:**

A.  Room and board and other institutional or nursing services that are provided for a person due to his or her age or mental or physical condition and mainly to aid the person in daily living; or

B.  Medical services that are given merely as care to maintain the person's present state of health and which cannot be expected to improve a medical condition to a great extent.

**II.19  Deductible:**

A specified dollar amount of Covered Medical Expenses that must be incurred before any other Covered Medical Expenses can be considered for payment according to the applicable coinsurance.

**II.20  Dependent:**

A.  In order to be covered as a "dependent" a person must meet one of the following four definitions:

1.  A person who is the Covered Employee or Retiree's legal spouse provided such spouse meets all requirements of a legal marriage in the state of Florida.

2.  A person who is the Covered Employee or Retiree's child provided that the child meets all of the following conditions:

a) Is unmarried.

b) Meets the definition of a child as specified in Section II.10.

c) Is in the custody of the Covered Employee or Retiree. This requirement may be waived if the Covered Employee or Retiree is required to provide health care coverage due to a court order or a divorce decree for a child who is not in the Covered Employee or Retiree's custody.

d) Is financially dependent upon the Covered Employee or Retiree for more than fifty (50) percent of the child's needs. This requirement may be waived if the Covered Employee or Retiree is required to provide coverage due to a court order or a divorce decree for a child who is not wholly dependent upon the Covered Employee or Retiree for more than fifty (50) percent of the child's needs as documented by the Covered Employee's federal income tax return.

e) Is not more than nineteen (19) years of age as of the last day of the plan year. This requirement may be waived if the child is over nineteen (19) years of age but less than twenty-five (25) years of age as of the last day of the plan year AND is:

3. Dependent upon the Covered Employee or Retiree for at least fifty (50) percent of the child's financial support, AND is either:

a). Enrolled as a regular full-time or part-time student in an accredited college, university, trade school or vocational school, OR

b). Living in the household of the Covered Employee or Retiree.

c). A person who is the Covered Employee or Retiree's child as defined in Part II Section 10 provided that the child has attained the limiting age of age twenty-five (25) and meets *all* of the following criteria:

1) Is mentally retarded or physically disabled, and such mental retardation or disability was incurred prior to the age of 19, AND is

2) Incapable of earning his or her own living and dependent on the Covered Employee or Retiree for support, AND is

3) Is unmarried.

4. A person who is the covered employee's Retiree's child as defined in Section II.10 provided that the child is mentally retarded or physically disabled, and such mental retardation or disability was incurred prior to the age of 19 AND is:

Proof of age, financial dependency, residence, school enrollment, and/or physical or mental impairment shall be required from time to time. Such proof must be provided at the time of initial health care enrollment, upon attainment of a limiting age and within thirty (30) calendar days upon request.

The Employer or Third Party Administrator shall have the right at any time during the continuation of coverage under this paragraph to require due proof of the continuance of any incapacity (see Section II.20) and to have the dependent

- 14 -

examined by designated doctors any time during the first two years of such continuance and not more often than once a year thereafter.

B.   Those situations specifically excluded from the definition of an eligible dependent are

    1.   A spouse who is legally separated or divorced from the Covered Employee, unless coverage is required due to court order or decree, in which case COBRA Conversion will be available.  Such spouse must have met all requirements of a valid separation or divorce contract in the state granting such separation or divorce; or

    2.   Any person on active military duty; or

    3.   Any person covered under this Plan as an individual participant; or

    4.   Any person who is covered as a Dependent by one Covered Person in this Plan.

### II.21  Dependent Coverage:

Eligibility under the terms of the Plan for benefits payable as a consequence of eligible expenses incurred for an illness or injury of a dependent.

### II.22  Durable Medical Equipment:

Equipment that is designed and intended for repeated use, primarily and customarily used to serve a medical purpose, generally not useful to a person in the absence of a disease or injury, and is appropriate for use in the home.

### II.23  Elective Surgery:

Any non-emergency surgical procedure.

### II.24  Emergency Care:

Medical treatment for a condition which, unless treated at once, would:

A.   Jeopardize the patient's life; or

B.   Cause serious impairment to the patient's bodily function.

### II.25  Employer

Brevard Public Schools and subsidiaries or affiliated organizations.

### II.26  Enrollment Date:

The first day that Covered Employees, Retirees, and Dependents are eligible to enroll in the health plan.

**II.27  Extended Care Facility:**

An institution or distinct part thereof, operated pursuant to law and which meets all of the following conditions:

A.  It is licensed to provide, and is engaged in providing, for persons convalescing from injury or illness, inpatient professional nursing services rendered by a Registered Nurse (R.N.) or by a Licensed Practical Nurse (L.P.N.) under the direction of a Registered Nurse, and physical restoration services to assist patients in reaching a degree of body functioning to permit self care in essential daily living activities; and

B.  Its services are provided for compensation from its patients and under the full-time supervision of a physician or Registered Nurse (R.N.); and

C.  It provides twenty-four(24) hour-per-day nursing services by licensed nurses, under the direction of a full-time Registered Nurse (R.N.); and

D.  It maintains a complete medical record on each patient and has an effective Utilization Review Plan; and

E.  It is not, other than incidentally, a place for rest, the aged, drug addicts, alcoholics, mental retardates, custodial or educational care, or care of mental disorders; and

F.  It is approved and licensed by Medicare.

This term shall also apply to an institution referring to itself as a Skilled Nursing Facility, Rehabilitative Facility, Convalescent Nursing Facility or any such other similar nomenclature.

**II.28  HIPAA:**

Health Insurance Portability and Accountability Act of 1996.

**II.29  Home Health Services:**

Medical care and treatment provided in the home by a public or private agency or organization meeting all of the following conditions:

A.  It is primarily engaged in and duly licensed, if such licensing is required, by the appropriate licensing authority to provide skilled nursing services and other therapeutic services.

B.  Policies are established by a professional group associated with the agency or organization. This professional group must include at least one physician and at least one Registered Nurse (R.N.) to govern the services provided and it must provide for full-time supervision of such services by a physician or Registered Nurse (R.N.).

C.  It maintains a complete medical record on each individual.

D.  It has a full-time administrator.

E.  It meets Medicare guidelines.

**II.30  Hospice:**

A healthcare program providing a coordinated set of services rendered at home, in outpatient settings or in institutional settings for covered persons suffering from a condition that has a terminal prognosis.  A hospice must have an interdisciplinary group of personnel that includes at least one physician and one Registered Nurse (R.N.), and it must maintain central clinical records on all patients.  A hospice must meet the standards of the National Hospice Organization (NHO) and applicable state licensing requirements.

**II.31  Hospital:**

An institution that meets all of the following conditions:

A.  It is engaged primarily in providing medical care and treatment to ill and injured persons on an inpatient basis at the patient's expense;

B.  It is constituted, licensed, and operated in accordance with the laws of jurisdiction in which it is located which pertain to hospitals; and

C.  It maintains on its premises all the facilities necessary to provide for the diagnosis and medical and surgical treatment of an illness or an injury; and

D.  Such treatment is provided for compensation by or under the supervision of physicians with continuous twenty-four (24) hour nursing services by Registered Nurses (R.N's); and

E.  It qualifies as a hospital, a psychiatric hospital, or a tuberculosis hospital and is accredited by the Joint Commission on the Accreditation of Health Care Organizations (JCAHO); and

F.  It is a provider of services under Medicare; and

G.  It is not, other than incidentally, a place for rest, the aged, drug addicts, alcoholics, a nursing home, or a skilled nursing unit.

**II.32  Illness:**

A bodily disorder, disease, physical sickness, mental infirmity, or functional nervous disorder of a Covered Person.  A recurrent illness will be considered one illness. Concurrent illnesses will be considered one illness unless the illnesses are totally unrelated.

**II.33  Injury:**

A condition caused by accidental means that result in damage to the Covered Person's body from an external force.

**II.34   Inpatient:**

The term "Inpatient" refers to the classification of a Covered Person when that person is admitted to a hospital for at least twenty-four (24) hours for treatment and charges are made for room and board to the Covered Person as a result of such treatment.

**II.35   Intensive Care Unit:**

A section, ward, or wing within the hospital which is separated from other facilities and

A.   Is operated exclusively for the purpose of providing professional medical treatment for critically ill patients;

B.   Has special supplies and equipment necessary for such medical treatment; available on a standby basis for immediate use; and

C.   Provides constant observation and treatment by Registered Nurse's (R.N.'s) or other highly trained hospital personnel.

**II.36   Licensed Practical Nurse:**

An individual who has received appropriate nursing training and is authorized to use the designation of "L.P.N." and who is duly licensed by the state or regulatory agency responsible for such licensing in the state in which the individual performs such nursing services.

**II.37   Medical Child Support Order:**

Any judgment, decree, or order (including approval of a settlement agreement) issued by a court of competent jurisdiction which provides for child support with respect to a child of a participant under a group health plan or provides for health benefit coverage to such child, and is made pursuant to a state domestic relations law (including a community property law), and is related to benefits under the plan.

**II.38   Medical Emergency:**

A sudden and unexpected condition of such severity that it requires immediate need of medical attention.

**II.39   Medically Necessary:**

In the opinion of the Utilization Management Provider, services required to identify or treat the illness or injury that a physician has diagnosed or reasonably suspects.  The service must be

A.   Consistent with the diagnosis and treatment of patient's condition; and

B.   In accordance with standards of good medical practice; and

C.   Required for reasons other than convenience of the patient or physician.  *The fact that a service is prescribed by a physician or deemed by that physician to be medically necessary, does not mean that such service is considered medically necessary, nor that it will be covered by this Plan.*

**II.40   Medicare:**

TITLE XVIII of the Federal Social Security Act, as it now is, or as it may be changed.

**II.41   Network (Participating) Provider:**

Any participating doctor, hospital, pharmacy, or other healthcare provider that has an in-force agreement to provide healthcare services for persons insured under this policy.

**II.42   Newborn:**

An infant from the date of birth until the initial hospital discharge or until the infant is fourteen (14) days old, whichever occurs first.

**II.43   No-Fault Motor Vehicle Plan:**

A motor vehicle plan that is required by law and provides medical or dental care payments that are made, in whole or in part, without regard to fault.

**II.44   Nurse Midwife:**

A person certified to practice as a Nurse Midwife whom has an active license as a Registered Nurse granted by a Board of Nursing and who has completed a state-approved program for the preparation of Nurse Midwives.

**II.45 Office Surgery:**

Invasive surgical procedures and invasive diagnostic procedures performed in a physician's office where no facility fee is charged. Office surgery is subject to co-payment provisions.

**II.46 Out-of-Area Coverage:**

College Students and other Out-of-Area Members:

Covered College Students residing outside the Brevard County Service area are eligible to receive covered medical services from participating state and national network providers where available. All pre-certification and utilization management requirements are applicable.

BlueCross BlueShield of Florida (BCBSF) BlueCare HMO

BCBSF BlueCare HMO Plan requires that the primary member live in the State of Florida. College students living out of State may enroll in the Away From Home Program to access an out-of-state HMO network, if one exists where they attend school. Dependents may be approved for the Away From Home Program for up to 12 months and must renew enrollment in the program annually. Members who live in Florida but will be traveling or living outside of Florida for more than 90 days must enroll in the Away From Home Program to be able to access the HMO network where they will be temporarily residing if one exists in that area. Members can only be enrolled in the Away From Home Program

for 6 months. Necessary emergency care is covered at the in-network benefit level regardless of the network affiliation of the provider or emergency facility.

### BlueCross BlueShield of Florida (BCBSF) BlueChoice PPO

BCBSF BlueChoice PPO plan members residing or traveling outside the State of Florida are eligible to use the national participating provider network, where available. Necessary emergency care is covered at the in-network benefit level regardless of the network affiliation.

### CIGNA EPO, PPO, and Basic Plans

CIGNA EPO, PPO, and Basic Plan members residing outside the Brevard County service area are eligible to use the state and national participating provider network, where available. Necessary emergency care outside the Brevard County service area is covered at the in-network benefit level.

### II.47 Out-of-Network (Non-Participating) Provider:

Any non-participating doctor, hospital, pharmacy or other health care provider that does not have an in-force agreement to provide health care services for persons insured under this policy.

### II.48 Out-of-Pocket Expenses:

The sum of:

A.    Any covered medical expenses used toward satisfaction of any applicable deductible; and
B.    Any covered medical expense which exceeds the deductible and for which benefits are not payable after the applicable percentage specified in the Schedule of Benefits is applied.

### II.49 Outpatient:

The classification of a Covered Person when that Covered Person receives medical care, treatment, services, or supplies at a clinic, a physician's office, or a hospital if not a registered bed patient at that hospital; an outpatient psychiatric facility; or an outpatient alcoholism treatment facility.

### II.50 Outpatient Surgery:

Surgery that includes medical services received at an outpatient facility connected to a hospital; an ambulatory surgical center; and outpatient procedures performed in the office if a facility fee is charged. Outpatient office procedures include invasive surgical procedures and invasive diagnostic procedures.

## II.51 Physician:

A person acting within the scope of his or her license and holding the degree of Doctor of Medicine (M.D.), Doctor of Osteopathy (D.O.), Doctor of Dental Surgery (D.D.S.), Doctor of Medical Dentistry (D.M.D.), Doctor of Podiatry (D.P.M.), or Doctor of Chiropractic (D.C.), and who is permitted to perform services provided in this Plan. A Physician shall not include the Covered Person or parent, spouse, brother, sister, child, or any other family member of the Covered Person.

## II.52 Plan:

Without qualification, this Plan Document, also referred to as The Brevard Public Schools' Benefit Plan.

## II.53 Plan Year:

A period of time commencing with the effective date of this Plan or the Plan anniversary, and terminating on the date of the next Plan anniversary. The Plan Year is January 1 through December 31, unless otherwise noted.

## II.54 Pre-Certification:

The Utilization Management Provider's review to determine the medical necessity and/or appropriateness of the care or treatment of a Covered Person's condition.

## II.55 Pre-Existing Condition:

A physical or mental condition regardless of the cause for which medical advice; diagnosis, care, or treatment was recommended or received within the six (6) month period ending on the individual's Enrollment Date. Physical or mental conditions meeting this definition may not be covered for a specific time period. Pre-Existing Condition provisions do not apply to Employees or Retirees who have been continuously covered by a medical plan sponsored by this employer.

## II.56 Primary Care Physician:

A participating physician who is responsible for providing primary care to Covered Persons and assisting in the continuity of care received by Covered Persons. Each Covered Person is encouraged to select a PCP. A Primary Care Physician (PCP) is defined as a Family or General Practitioner, an Internal Medicine Physician, and/or a Pediatrician.

## II.57 Pregnancy:

That physical state which results in childbirth, abortion, or miscarriage.

**II.58 Preventive Care:**

Routine covered services provided absent of sickness or a diagnosis.

**II.59 Psychiatric Care:**

Treatment for a mental illness or disorder, a functional nervous disorder, alcoholism, drug addiction, or eating disorders when such treatment is medically necessary as a result of a specifically identifiable and diagnosed medical condition of disease etiology.

**II.60 Qualified Medical Child Support Order:**

A Medical Child Support Order which creates or recognizes the existence of an Alternate Recipient's right to, or assigns to an Alternate Recipient the right to, receive benefits for which a participant or beneficiary is eligible under a group health plan. To be "Qualified," a Medical Child Support Order must also

A.    State the name and last known mailing address (if any) of the Employee, and the name and mailing address of any Alternate Recipient covered by the order;
B.    Provide a reasonable description of the type of coverage to be provided by the plan, or a reasonable description of the manner in which such coverage is to be determined;
C.    State the period to which the order applies; and
D.    Show the plans to which it applies.

**II.61 Referral Process (HMO/EPO/Basic Plans):**

In rare instances where specialty care is required but not available within the network, a referral to a non-network provider may be authorized. Referrals to non-network providers must be approved by the Utilization Management Provider in advance of services.

**II.62 Registered Nurse:**

An individual who has received specialized nursing training and is authorized to use the designation of "R.N." and who is duly licensed by the state or regulatory agency responsible for such licensing in the state in which the individual performs such nursing services.

**II.63 Retiree:**

A former Covered Employee who retires from Brevard Public Schools and was a member of the Plan at the time of retirement. Retirement may be early, normal, or for disability and must be applied for at the time of leaving employment in order to continue benefits.

**II.64 Skilled Nursing Care:**

Treatment consisting of confinement of a Covered Person to an Extended Care Facility. Such confinement must meet all of the following conditions:

A.    Such confinement must commence within fourteen (14) days of being discharged from a hospital; and

B.    Said hospital confinement must have been for a period of not less than three (3) consecutive days; and

C.    Both the hospital and Extended Care confinements must have been for the care and treatment of the same illness or injury.

A convalescent period will terminate when the first of these dates occurs:

1)    Fourteenth day in a row after the date the Covered Person is not confined to the facility or a hospital;

2)    The date the Covered Person returns to active work, or in the case of a dependent, when he or she is able to perform the normal activities of a person of the same age and sex.

## II.65 Summary Plan Description:

This document, which describes details of Brevard Public Schools' self-funded Medical Plan. The Summary Plan Description supersedes any other documentation pertaining to this Plan, including earlier versions of this document; materials from Third Party Administrators; or verbal representations, regardless of the source.

## II.66 Third Party Administrator:

A firm employed to provide administrative services to the Employer in connection with the operation of the Plan including the approval and processing of claims for payment and the performance of other Plan-connected services.

## II.67 Total Disability (Totally Disabled):

A physical state of a Covered Person resulting from an illness or injury in which

A.    The Covered Employee is completely unable to perform the duties of his or her occupation and is not performing any other work or engaging in any other occupation or employment for wage or profit; or

B.    A dependent is completely unable to perform the normal activities of a person of the same age and sex.

## II.68 Urgent Care:

Medical treatment for a condition that would not jeopardize the patient's life or cause serious impairment to the patient's bodily function but which requires immediate medical attention and is not performed in an emergency department.

## II.69 Usual, Customary, and Reasonable:

The designation of a charge as being the usual charge made by a physician or other provider of services, supplies, medications, or equipment and that does not exceed the general level of charges made by other providers rendering or furnishing such care or treatment within the same area. The term "area" in this definition means a county or such

other area as is necessary to obtain a representative cross section of such charges. Due consideration will be given to the nature and severity of the condition being treated and any medical complications or unusual circumstances that require additional time, skill, or expertise, as determined by the Plan's Third Party Administrator.

### II.70 Utilization Management Provider:

The firm contracted by the Brevard Public Schools to perform medical management functions and medical determinations on behalf of Covered Members for Covered Services under this Plan.

### II.71 Well Baby Care:

Treatment, services, or supplies rendered to a child or newborn solely for the purpose of health maintenance and not for the treatment of an illness or injury.

### II.72 Well Child Care:

Treatment, services or supplies rendered to a child per the guidelines set forth by the State of Florida for Well Child Care.

## Part III

## SCHEDULE OF BENEFITS

### BlueCross BlueShield of Florida BlueCare HMO and CIGNA EPO Plans

*THE HMO AND EPO PLANS ARE IN-NETWORK ONLY PLANS, AND NO BENEFITS WILL BE PAID FOR SERVICES PROVIDED BY A NON-NETWORK PROVIDER, UNLESS OTHERWISE SPECIFIED IN THIS DOCUMENT*

| Benefit Feature | Benefit |
|---|---|
| Lifetime Maximum | $1 Million |
| Out of Pocket Maximum | $1,500 Per Individual |
| Per Calendar Year | $3,000 Per Family |
| In-Patient Hospital; average semi-private rate | 100% Coverage, after $300 copay/admission |
| Outpatient Surgery | 100% Coverage, after $25 copay |
| Office Visit (PCP ) | 100% after $15 copay** |
| Office Visit (Specialist) | 100% after $25 copay** |
| Diagnostic Services (Major) | 100% coverage, after $50 copay |
| Preventive Care Benefits | 100% after $15 copay** |
| Well Child Care - Per AMA & CDC Guidelines | 100% after $15 copay** |
| Annual Well-Woman Exam | 100% after $25 copay** |
| Routine or Diagnostic Mammography | 100% coverage |
| Routine Colonoscopy | 100% coverage |
| Maternity Care | 100% after $25 copayment, initial visit only** |
| Allergy Injections only without physician visit | 100% coverage |
| Ambulance Services | 100% coverage |
| Emergency Care<br>　-Emergency Room (copay waived if admitted)<br>　-Urgent Care | $75 copay (ER)<br>$25 copay (urgent care) |
| Skilled Nursing Facility (includes rehab hosp. & sub-acute facilities - limited to 120 days per calendar year) | 100% coverage |
| Home Health Care -- multiple visits can occur in one day with a visit defined as a period of 2 hours or less (to a max of 8 visits/day) | 100% coverage |
| External Prosthetic Devices<br>Limited to $15,000 per year | 100% coverage |
| Durable Medical Equipment | 100% coverage |
| Hospice | 100% coverage |
| Second Surgical Opinion (in-network only) | 100% after $25 copay** |
| Transplant Services<br>Maximum benefit for transportation, lodging, and meals $10,000, subject to guidelines in Section IV of this document | 100% at preferred facility after $300 per admission copay, otherwise 100% after $500 per admission copay |
| Diabetes Supplies | 100% coverage, after applicable copay |
| Chiropractic Coverage<br>Limited to $1,500 per calendar year | 100% after $25 copay** |
| Short-term rehabilitative Services (PT, ST, OT, pulmonary) Limited to a combined sixty (60) days per calendar year | 100% after $25 copay** |
| Cardiac Rehabilitative Services<br>Limited to 36 visits per calendar year | 100% after $25 copay** |
| Chemotherapy or Radiation Therapy in provider's office | 100% after $25 copay** |
| Penalty for failure to precertify listed procedures | N/A  Provider responsibility |

***NOTE: The copay includes all covered charges incurred during the course of the office visit, including x-ray and lab services, and charges for surgery performed in the office.**

*Additional limitations may apply, and some services are subject to prior authorization. See Covered Services section and Precertification/Utilization Management section of this document for additional Information.*

BlueCross BlueShield of Florida BlueChoice & CIGNA PPO Plans

| Benefit Feature | In-Network | Out-of-Network |
|---|---|---|
| Lifetime Maximum | $1 million | $1 million |
| Deductible | $300/year individual<br>$600/year family | $400/year individual<br>$800/year family |
| Out of Pocket Maximum<br>Per Calendar Year | $2,000/year individual<br>$4,000/year family | $4,000/year individual<br>$8,000/year family |
| In-Patient Hospital; average semi-private rate | Pays 85% after deductible | Pays 70% after deductible |
| Outpatient Surgery | Pays 85% after deductible | Pays 70% after deductible |
| Office Visit (PCP or Specialist) | 100% after $25 copay ** | Pays 70% after deductible |
| Major Diagnostic Services (MRI, CT, PET) | Pays 85% after deductible | Pays 70% after deductible |
| Allergy Injections only without Physician Visit | Pays 100% | Pays 70% after deductible |
| Preventive Care Benefits | 100% after $25 copay ** | Pays 70% after deductible |
| Well Child Care per AMA & CDC Guidelines | 100% after $25 copay** | Pays 70% after deductible |
| Annual Well-Woman Exam | 100% after $25 copay** | Pays 70% after deductible |
| Routine or Diagnostic Mammography | Pays100% | Pays 70% after deductible |
| Routine Colonoscopy | Pays 100% | Pays 70% after deductible |
| Maternity Care | Pays 85% after deductible | Pays 70% after deductible |
| Ambulance Services | Pays 85% after deductible | Pays 70% after deductible |
| Emergency Room | Pays 85% after deductible | Pays 85% after deductible |
| Urgent Care Center | Pays 85% after deductible | Pays 70% after deductible |
| Skilled Nursing Facility (includes rehab hosp. & sub-acute facilities - limited to 120 days per calendar year) | Pays 85% after deductible | Pays 70% after deductible |
| Home Health Care -- Multiple visits can occur in one day' with a visit defined as a period of 2 hours or less to a max of 8 visits/day | Pays 85% after deductible | Pays 70% after deductible |
| External Prosthetic Devices<br>Limited to $15,000 per year | Pays 85% after deductible | Pays 70% after deductible |
| Durable Medical Equipment | Pays 85% after deductible | Pays 70% after deductible |
| Hospice | Pays 85% after deductible | Pays 70% after deductible |
| Second Surgical Opinion | Pays 100% | Pays 70% after deductible |
| Transplant Services<br>Maximum benefit for transportation, lodging and meals $10,000, subject to guidelines in Section IV of this document | 100% at preferred facility, otherwise 85% after deductible | Pays 70% after deductible |
| Diabetes Supplies | Pays 85% after deductible | Pays 70% after deductible |
| Chiropractic Coverage<br>Limited to $1,500 per calendar year | 100% after $25 copay** | Pays 70% after deductible |
| Short-term rehabilitative Services (PT, ST, OT, pulmonary) - Limited to a combined sixty (60) visits per calendar year | 100% after $25 copay** | Pays 70% after deductible |
| Cardiac Rehabilitative Services<br>Limited to 36 visits per calendar year | 100% after $25 copay** | Pays 70% after deductible |
| Chemotherapy, Radiation Therapy in provider's office | 100% after $25 copay** | Pays 70% after deductible |
| Penalty for failure to precertify listed procedures | N/A<br>Provider responsibility | 15% reduction in allowance of benefits |

**NOTE: The copay includes all covered charges incurred during the course of the office visit, including x-ray and lab services, and charges for surgery performed in the office.

Additional limitations may apply, and some services are subject to prior authorization. See Covered Services section and Precertification/Utilization Management section of this document for additional information.

**CIGNA Basic Plan**
*THE CIGNA BASIC PLAN IS AN IN-NETWORK ONLY PLAN, AND NO BENEFITS WILL BE PAID FOR SERVICES PROVIDED BY A NON-NETWORK PROVIDER, UNLESS OTHERWISE SPECIFIED IN THIS DOCUMENT*

| Benefit Feature | BENEFIT |
|---|---|
| Lifetime Maximum | $1 Million |
| Out of Pocket Maximum | $5,000 Per Individual |
| Per Calendar Year | $15,000 Per Family |
| In-Patient Hospital; average semi-private rate | 80% coverage, after $500 copay/admission |
| Outpatient Surgery | 80% coverage |
| Office Visit (PCP ) | 100% after $20 copay** |
| Office Visit (Specialist) | 100% after $30 copay** |
| Diagnostic Services (Major) | 80% coverage |
| Preventive Care Benefits | 100% |
| Well Child Care - Per AMA & CDC Guidelines | 100% |
| Annual Well-Woman Exam | 100% after $30 copay** |
| Routine or Diagnostic Mammography | 100% coverage |
| Routine Colonoscopy | 100% coverage |
| Maternity Care | 80% after $30 copay, initial visit only** |
| Allergy Injections only without physician visit | 100% coverage |
| Ambulance Services | $50.00 copay |
| Emergency Care<br>  -Emergency Room (copay waived if admitted)<br>  -Urgent Care | $100 copay (ER)<br>$50 copay (urgent care) |
| Skilled Nursing Facility (includes rehab hosp. & sub-acute facilities - limited to 120 days per calendar year) | 80% coverage |
| Home Health Care -- multiple visits can occur in one day; with a visit defined as a period of 2 hours or less up to a max of 8 visits/day | 80% coverage |
| External Prosthetic Devices<br>Limited to $15,000 per year | 80% coverage |
| Durable Medical Equipment | 80% coverage |
| Hospice | 80% coverage |
| Second Surgical Opinion (in-network only) | 100% after $30 copay** |
| Transplant Services<br>Maximum benefit for transportation, lodging and meals $10,000, subject to guidelines in Section IV of this document | 100% at preferred facility after $500 per admission copay, otherwise 80% after $500 per admission copay |
| Diabetes Supplies | 80% coverage, after applicable copay |
| Chiropractic Coverage<br>Limited to $1,500 per calendar year | 100% after $30 copay** |
| Short-term rehabilitative Services (PT, ST, OT, pulmonary) Limited to a combined sixty (60) days per calendar year | 100% after $30 copay** |
| Cardiac Rehabilitative Services<br>Limited to 36 visits per calendar year | 100% after $30 copay** |
| Chemotherapy or Radiation in provider's office | 100% after $30 copay** |
| Penalty for failure to precertify listed procedures | N/A  Provider responsibility |

**\*\*_NOTE:_** *The copay includes all covered charges incurred during the course of the office visit, including x-ray and lab services, and charges for surgery performed in the office.*

*Additional limitations may apply, and some services are subject to prior authorization. See Covered Services section and Precertification/Utilization Management section of this document for additional information.*

**BEHAVIORAL HEALTH SERVICES** (provided by Bradman/Unipsych)

Mental/Nervous and Substance Abuse Conditions

Inpatient      100% after $200 co-payment per admission. Calendar Year Maximum 31 days

Outpatient     100% after $10 co-payment per visit. Calendar Year Maximum 60 visits

Substance Abuse services limited to a lifetime maximum of $10,000.

For additional information regarding mental health, substance abuse, and EAP services, refer to the Bradman/Unipsych Handbook or call 1-800-272-3626.

**PHARMACY SERVICES** (provided by Walgreen's Health Initiatives)

**BCBSF BlueCare & BlueChoice, CIGNA EPO & PPO**

|               | **Retail** | **Advantage 90/Mail Order*** |
|---------------|-----------|------------------------------|
| Generic       | $10.00    | $20.00                       |
| Brand         | $20.00    | $40.00                       |
| Non-Preferred | $35.00    | $70.00                       |

* Note:  The Mail Order and Advantage 90 copayments equal payment of two (2) copayments
         for a three(3) month supply of prescription maintenance drugs.

**CIGNA Basic**

Deductible              $50 Individual/$100 Family
Out-of-Pocket Max       $1,500 Individual/$$3,000 Family

|               | **Retail** | **Advantage 90/Mail Order*** |
|---------------|-----------|------------------------------|
| Generic       | 30% after deductible (min. $10) | 30% after deductible (min. $20) |
| Preferred     | 30% after deductible (min. $20) | 30% after deductible (min. $40) |
| Non-Preferred | 30% after deductible (min. $30) | 30% after deductible (min. $60) |

* Note:  The Mail Order and Advantage 90 copayments equal payment of two(2) copayments
         for a three (3) month supply of prescription maintenance drugs.

**Note:  For all Plans, you must utilize a participating in-network pharmacy.  There is no
         out-of-network benefit in the pharmacy program.**

For additional information regarding pharmacy benefits and services, refer to Part IV, Coverage Provisions, Prescription Drug Benefit in this document, or call WHI at 1-800-207-2568.

## PART IV

## COVERAGE PROVISIONS

**Covered Medical Expenses:** Benefits are paid for the following services and supplies which are necessary for treatment to the extent that the charges do not exceed the Plan's fee schedule or usual, customary, and reasonable charges generally made in the same locality under similar conditions. Benefits are payable based on the Schedule of Benefits in Part III, and subject to the exclusions listed in Part V:

**Physician Care:** All Covered Services furnished by a Participating Physician during an office visit, hospital visit, or house call for the diagnosis and treatment of a disease or injury.

**Hospital Care:** Inpatient services and supplies including professional services, semi-private room and board, general nursing care, and related services and supplies; outpatient services and supplies furnished on an outpatient basis.

**Ambulatory Surgery Center:** Outpatient services and supplies furnished by a surgery center in connection with a Covered surgical procedure, on the day of the procedure.

**Skilled Nursing Facility:** Care and treatment, including room and board in semi-private accommodations at a skilled nursing facility. Such services must be supported by a treatment plan approved in advance by the Utilization Management Provider. Custodial care is not covered, and the provision of skilled nursing services incidental to custodial care shall not obligate the Plan to cover such custodial care services. Coverage is subject to the calendar year maximum number of days in the Schedule of Copayments.

**Hospice Care:** Provided as part of a Hospice program for Members with a prognosis of 6 months or less to live. Includes coverage for Members who are confined as an inpatient in a Hospital, Skilled Nursing Facility, or Hospice, or who are receiving care on an outpatient basis from a hospice care agency. Coverage includes supportive care involving the evaluation of the emotional, social, and environmental circumstances related to or resulting from a Member's illness. It also includes guidance and assistance given during the Member's illness for the purpose of preparing the Member and the Member's immediate family for imminent death. Immediate family shall be limited to the Member's parents, spouse, and children, and the siblings of terminally ill children Members, regardless of whether or not they are enrolled in the Health Plan. Coverage is not provided for bereavement counseling, funeral arrangements, pastoral counseling, financial or legal counseling, homemaker or caretaker services (services not solely related to the care of the person, including, but not limited to: sitter, or companion services for the Member who is ill or other members of the family, transportation, housecleaning, and maintenance of the house.), and respite care (care furnished during a period of time when the Member's family or usual caretaker cannot, or will not, attend to the Member's needs).

**Home Health Care:** Services and supplies furnished in the home by a Home Health Care Agency or Health Professional, including but not limited to registered nurses, licensed practical nurses, physical therapists, respiratory therapists, speech therapists, and home health aides.

- 29 -

**Durable Medical Equipment:** The Member shall be entitled to Coverage for Durable Medical Equipment that is ordered or prescribed by a Physician and provided by a vendor approved by the Plan for use outside a hospital or other health care facility. Coverage for repair, replacement or duplicate equipment is provided only when required due to anatomical change and/or reasonable wear and tear. All maintenance and repairs that result from a person's misuse are the person's responsibility. Coverage for Durable Medical Equipment is limited to the lowest-cost alternative as determined by the utilization review physician.

Durable Medical Equipment items that are not covered include but are not limited to those that are listed below:

**Bed related items:** bed trays, over the bed tables, bed wedges, pillows, custom bedroom equipment, mattresses, including non-power mattresses, custom mattresses and posturepedic mattresses.

**Bath related items:** bath lifts, non-portable whirlpools, bathtub rails, toilet rails, raised toilet seats, bath benches, bath stools, hand held showers, paraffin baths, bath mats, and spas.

**Chairs, lifts and standing devices:** computerized or gyroscopic mobility systems, roll about chairs, geriatric chairs, hip chairs, seat lifts (mechanical or motorized), patient lifts (mechanical or motorized – manual hydraulic lifts are covered if patient is two person transfer), and auto tilt chairs.

**Fixtures to real property:** ceiling lifts and wheelchair ramps.

**Car/van modifications.**

**Air quality items:** room humidifiers, vaporizers, air purifiers and electrostatic machines.

**Blood/injection related items:** blood pressure cuffs, centrifuges, nova pens and needleless injectors.

**Other equipment:** heat lamps, heating pads, cryounits, cryotherapy machines, electronic-controlled therapy units, ultraviolet cabinets, sheepskin pads and boots, postural drainage board, AC/DC adaptors, enuresis alarms, magnetic equipment, scales (baby and adult), stair gliders, elevators, saunas, any exercise equipment and diathermy.

Exercise equipment is not a covered benefit, even when prescribed by a physician. Support stockings will not be covered. Compression hose obtained through a medical supply house with a physician's prescription will be covered.

**Prosthetic Devices:** Initial provision and replacement of a prosthetic device that temporarily or permanently replaces all or part of an external body part lost or impaired as a result of disease or injury or congenital defects is covered. Coverage includes repair and replacement when due to developmental growth. Instruction and appropriate services required for the Member to properly use the item (such as attachment or insertion) are covered. Covered prosthetic appliances include those items covered by Medicare unless excluded in the Exclusions and Limitations section of this Certificate. The Plan reserves the right to provide the most cost efficient and least restrictive level of service or item which can be safely and effectively provided. (Limitations: All maintenance and repairs that result from misuse or abuse are the responsibility of the Member.) Wigs when necessary due to the loss of hair resulting from treatment for a medically related condition (e.g., chemotherapy) are limited to a lifetime maximum limit of $250.00.

**Maternity Care:** Services and supplies furnished by a Hospital or Physician for prenatal care (including genetic testing), postnatal care, delivery and care for the complications of pregnancy. Coverage does not include routine maternity care (including delivery) received while outside the Health Plan's Service Area.

**Termination of Pregnancy:** Services and supplies for therapeutic (or non-therapeutic in cases of rape, incest, or fetal malformation) termination or pregnancy.

**Newborn Child Care:** Services and supplies for the treatment of disease or injury, including care for the treatment of congenital defects and birth abnormalities which cause anatomical functional impairment and premature births and inter-facility transfer of the newborn to the nearest appropriate facility to treat the newborn's condition.

**Family Planning:** Diagnostic, counseling, and planning services for treatment of the underlying cause of infertility. Diagnostic procedures are limited to sperm count, endometrial biopsy, hysterosalpingography, and diagnostic laparoscopy.

**Emergency Care:** The Member must notify or arrange for his or her representative to notify the Health Plan of Hospital confinement following a Medical Emergency by the end of the next business day following the start of such confinement or as soon as it is reasonably possible to provide such notice. Follow-up care which is provided to the Member after the Medical Emergency has terminated must be provided by a Participating Provider within the Health Plan.

**Ambulance Services:** Services to the nearest medical facility capable of providing Medical Emergency care, or when not a Medical Emergency, inter-facility ambulance transfers.

**Allergy Testing:** Including evaluations and injections, except the following tests are not covered services: skin titration (Rinkle Method); Cytotoxicity Testing (Bryan's Test); MAST Testing; urine autoinjections; provocative and neutralization testing for allergies.

**Mammography:** One baseline mammography between ages of 35 and 39, one mammography every year beginning age 40 and over, or in accordance with recommendations from a Participating Physician.

**Short-term Rehabilitative Therapy:** Physical, occupational, and speech therapy and pulmonary rehabilitation received on an inpatient or outpatient basis, and which will significantly improve the Member's condition within sixty (60) days from the date therapy begins. The services must be directed and monitored by a Participating Physician. Coverage is subject to the calendar year combined maximum of sixty (60) visits. The maximum number of visits will be reduced by any visits by a therapist that are received as a part of home health care.

**Cardiac Rehabilitative Therapy:** Cardiac therapy that will significantly improve the Member's condition. Coverage is subject to the calendar year maximum of 36 days.

**Radiology Examinations and Laboratory Procedures**: All Covered diagnostic and therapeutic radiology services and laboratory tests furnished on an outpatient basis.

**Cosmetic, Plastic, and Reconstructive Surgery:** For the correction of congenital birth defects and effects of disease or injury which cause anatomical functional impairment when such surgery is reasonably expected to correct the condition, as determined by the Utilization Management Provider; reconstruction of the breast on which a mastectomy has been performed, surgery and reconstruction of the other breast to produce a symmetrical appearance, prostheses (e.g., breast implant), and treatment for physical complications of the mastectomy, including lymphedema. All surgical services provided under this subsection must be performed within 2 years of the event causing the impairment. Reduction mammoplasty is covered when performed to relieve symptoms related to the heaviness and size of the breast. A minimum of 350g of excess breast tissue must be removed per breast. Breast reductions will not be a Covered Benefit if these criteria are not met. Surgery performed for cosmetic purposes or for the correction of deformities resulting from previous cosmetic surgery are not covered.

**Oral Surgery:** Reduction or manipulation of fractures of facial bones; excision of tumors or cysts of the mandible, other facial bones, mouth, lip, or tongue; incision of tumors or cysts of the accessory sinuses, the mouth, the salivary glands, or the ducts; reconstruction or repair of soft tissues of the mouth or lip necessary to correct anatomical functional impairment caused by congenital defect or accidental injury. Non-surgical treatment of TMJ is not covered. Dental treatment in connection with an accidental injury to sound natural teeth is covered provided a continuous course of dental treatment is started within 6 months of the accident. Sound natural teeth are defined as natural teeth that are free of active clinical decay, have at least 50 percent bony support, and are functional in the arch.

**Internal Prosthetic Devices:** Surgically implanted internal prosthetic devices and special appliances to improve or restore function of an internal body organ that is lost or impaired due to disease or injury. Coverage includes repair and replacement when due to normal growth or normal wear and tear. Coverage is not provided for internal artificial organs and implantable insulin pumps.

**Enteral Formulae:** When required for (1) treatment of inborn errors of metabolism or inherited metabolic diseases (including disorders of amino acid and organic acid metabolism); or (2) enteral feeding for which the nutritional formulae under state or federal law can be dispensed only through a physician's prescription, and are medically necessary as the primary source of nutrition. This benefit is capped at $2,500 per calendar year.

**Charges Made for Injectable Drug:** For which a prescription is required, needles and syringes shall be covered under the Prescription Drug Benefit, subject to any applicable co-payment amounts.

**Elective Second Opinions:** That are provided in-network and any applicable co-payment, deductibles and/or coinsurance apply.

**Diabetic Supplies:** Shall be a covered benefit under the Prescription Drug Benefit at the benefit level defined for Diabetic Supplies in the Schedule of Benefits.

**Charges made by a Physician, Certified Diabetes Educator or Licensed Dietitian:** For a program which provides instruction on an outpatient basis for a person who has been diagnosed as having diabetes, for the purpose of instructing such person about the condition and its control.

**Sterilization:** Services and supplies for sterilization procedures such as tubal ligation and vasectomies.

**Transplants:** Benefits are payable for Organ or Tissue Transplant Services as shown in the Schedule of Benefits. Organ and tissue covered charges under this benefit include

- Bone marrow transplant, as defined herein, which is specifically listed in the rule 59B-127.001 of the Florida Administrative Code or any successor or similar rule or coverage by Medicare as described in the most recently published Medicare Coverage Issues Manual issued by the Center for Medicare and Medicaid Services. Coverage will be given for expenses incurred for the donation of bone marrow by a donor to the Covered Member to the same extent such expenses would be paid for the Covered Member and will be subject to the same limitations and exclusions as would be applicable to the Covered Member. Coverage for the reasonable expenses of searching for the donor will be limited to a search among immediate family members and donors identified through the National Bone Marrow Donor Program; Corneal transplant; Heart transplant (including a ventricular assist device, if indicated, when used as a bridge to heart transplantation)
- Heart-lung combination transplant
- Liver transplant
- Kidney transplant
- Pancreas transplant performed simultaneously with a kidney transplant
- Pancreas only
- Lung-whole single or whole bilateral transplant.

The procedure used to effect the transplant shall not be considered experimental or investigative as determined by the NIH, FDA or AMA. Charges must be incurred while the recipient is insured for these benefits. These charges must be due to an accidental injury or sickness covered by these benefits and must be pre-authorized and subject to review for medical necessity by the Medical Director of the Third Party Administrator. Transplants must be performed in an approved transplant facility. Donor costs and organ acquisition for transplants to benefit the Covered Member are covered provided such costs are not covered in whole or in part by any other insurance carrier, organization, or person other than the donor's family or estate. This benefit does not include medical and hospital services relating to the Covered Member providing organ donation. There are no benefits for artificial organ transplants. Travel expenses will apply to out-of-area Transplantation Work-up, Actual Transplantation, and Transplantation follow up. Travel expense covers the recipient of the transplant and one other travel companion over the age of 18 years, or two travel companions over the age of 18 years if the transplant recipient is under the age of 18 years. Travel companion may be a family member, significant other, donor of the organ, or any other person designated by the recipient. Travel expenses include one round trip per person per transplant, if the transplant is being performed more than 100 miles from the Covered Person's home. Air transportation, if applicable, is limited to coach fare.

Therapy to improve general physical condition including, but not limited to, cardiac and pulmonary rehabilitation

**Prescription Drug Benefit:** Benefits are payable as shown in the Schedule of Benefits for covered prescription drugs while the Covered Person is insured under this Plan. Covered

drugs are medications that, by law, can be obtained only when prescribed by a licensed physician or dentist and dispensed by a licensed pharmacist, unless specifically excluded. Insulin and birth control pills are included as covered drugs, as are hypodermic needles and syringes dispensed at the same time as the injectable drug. Generic drugs will be substituted, as provided by law, for prescriptions not marked "Dispense as Written."

The Advantage 90 and Mail Order Prescription Drug benefits are available for all Plans. Each prescription or refill will be for a 90-day supply. This benefit is for maintenance drugs only.

The prescription drug benefit must be used at participating pharmacies by presenting the pharmacy card. The Covered Person will be required to pay the difference in cost between a brand and generic drug if he or she requests a brand when a generic equivalent is available. Otherwise, brand name drugs will be filled at the applicable brand name copayment level.

Certain medications require prior authorization before the prescription will be filled. Please note that prior authorizations will last no longer than a period of 12 months. If the Covered Member still requires the drug after a period of 12 months, prior authorization must again be obtained.
Self-injectable drugs are available through the Pharmacy Program at the applicable copays, and will not be available through your doctor's office.

## PART V

## EXCLUSIONS AND LIMITATIONS

**Medical Plan:**

No benefits are available for any of the services, treatments, items, or supplies described in this section, even if either of the following is true: 1) It is recommended or prescribed by a Physician, or 2) It is the only available treatment for your condition.

Expenses for the following are NOT COVERED and no payment will be made for expenses incurred for

A.   Acupuncture except when performed by a Participating Physician as a form of anesthesia in connection with a covered surgery.

B.   Biofeedback and hypnotherapy.

C.   Cosmetic, plastic, or reconstructive surgery done primarily to improve the appearance of any portion of the body. Cosmetic, plastic, or reconstructive surgery exclusions include, but are not limited to surgery for sagging or extra skin, any augmentation or reduction procedures (e.g., mammoplasty), liposuction, keloids, and rhinoplasty and associated surgery.

D.   Court ordered services required by the court or as a condition of parole or probation.

E.   Custodial Care including the provision of room and board, nursing care, and personal care designed to assist a Member in the activities of daily living, or such other care which is provided to a Member who, in the opinion of the Utilization Management Provider, has reached the maximum level of physical or mental function and will not make further significant improvement. Custodial Care also includes home care and adult day care, provided or which could be provided by family member.

F.   Dental treatment of the teeth, gums, or structures directly supporting the teeth, including dental x-rays, examinations, repairs, orthodontics, periodontics, casts, splints, and services for dental malocclusion, for any condition.   Non-surgical treatment for TMJ. However, charges made for services or supplies provided for or in connection with an accidental injury to sound natural teeth are covered provided a continuous course of dental treatment is started within 6 months of the accident.   Sound natural teeth are defined as natural teeth that are free of active clinical decay, have at least 50 percent bony support, and are functional in the arch.

G.   Educational services and behavioral disorders for remedial education including evaluation or treatment of learning disabilities or minimal brain dysfunction, developmental and learning disorders, behavioral training, and cognitive rehabilitation. Services, treatment or diagnostic testing related to behavioral (conduct) problems, learning disabilities, developmental delays or attention deficit disorders, and educational testing or training.

H.   Exercise Equipment, whether or not prescribed or recommended by a Physician.

- 35 -

I.      Experimental or investigational procedures.

J.      Family planning, infertility, in-vitro fertilization; artificial insemination, embryo or ovum transfer procedures; surrogate parenting; implants; condoms; foams or devices; contraceptive jellies and ointments; elective abortions.

K.      Hair analysis.

L.      Any service for which the Member would not legally be obligated to pay in the absence of this Coverage.  Services performed by a relative.

M.      Illness or injury for which the Covered Person is entitled to benefits under any Worker's Compensation Law or Act.

N.      Mental retardation or defects and deficiencies of functional nervous disorders including chronic mental illness.

O.      Services and supplies deemed to be not medically necessary as determined by the Utilization Management Provider.

P.      Personal comfort or convenience items, household fixtures, and equipment not directly related to the care of the Member such as guest meals and accommodations, telephone charges, travel expenses, take-home supplies, and similar costs or devices solely for the convenience of the Member's caretaker.  The purchase or rental of household fixtures including, but not limited to, escalators, elevators, spas and swimming pools, exercise equipment, home modification, and equipment installation.

Q.      Recreational, educational, and sleep therapy and any related diagnostic testing, except when provided as part of a Covered inpatient Hospital service or Covered outpatient testing when prior authorization is obtained.

R.      Rehabilitation services that are not short-term rehabilitative therapy. Speech or occupational therapy to correct an impairment when this impairment is not due to disease or injury or a congenital defect for which corrective surgery has been performed.  Therapy to improve general physical condition except therapies specified for short-term rehabilitation.

S.      Religious, marital, and sex counseling.

T.      Reversal of sterilization.

U.      Routine foot care including corn and callous removal, nail trimming, and other hygienic or maintenance care; cleaning, soaking, and skin cream application for ambulatory and bed-confined patients including orthopedic shoes or other supportive devices of the feet, except nail trimming for diabetics only, limited to four times per year.

V.      Services required by third parties in connection with obtaining employment, any licensing, securing insurance coverage, foreign travel, and school admissions or attendance, including examinations required to participate in athletics.

W.    Sex change or transformation regardless of any diagnosis of gender role or psychosexual orientation problems.

X.    Unauthorized services and supplies not performed, prescribed, or arranged by a Participating Provider, except for Covered Services necessary to treat a Medical Emergency.

Y.    Vision care including but not limited to eyeglasses, frames, all types of contact lenses or corrective lenses, eye exercises, visual training, orthoptics, radial keratotomy and other refractive keratoplasties.

Z.    All services and supplies for the purpose of weight control, including surgical operations, procedures, or treatment of obesity.  .

AA.    Penile prostheses and male impotency medications.

BB.    Hearing aids or examinations for the prescription and/or fitting thereof.

CC.    Hepatitis B vaccines except as indicated in Well Child Care guidelines.

DD.    All procedures and services related to a non-covered service under the Plan, including conditions arising from complications of a non-covered service (e.g., complications from cosmetic surgery).

EE.    Genetic Screening, including the evaluation of genes of a Covered Plan Participants to determine if they are carriers for an abnormal gene that puts them at risk for a disease. Amniocentesis required during pregnancy is covered.

FF.    Any organ or tissue transplant, except otherwise listed in Part IV and in Part III Schedule of Benefits.

GG.    Consumable medical supplies (other than ostomy and urinary catheters). Excluded supplies include, but are not limited to, bandages and other disposable medical supplies; skin preparations and test strips, except specified in "Home Health Care" or "Cosmetic, Plastic and Reconstructive Surgery" sections of Covered Medical Expenses.

HH.    Cosmetics, dietary supplements, health and beauty aids, and nutritional formulae, except as specified in Part IV Coverage Provisions.

II.    Massage Therapy.

JJ.    Implantable Insulin Pumps.

KK.    Charges for the first $10,000 of bodily injury to a person while riding a motorcycle without a helmet.

LL.    Illness or injury to which a contributing cause was the commission of, or attempted commission of an act of aggression or a felony, or participation in a riot by the Covered Member.

- 37 -

MM.   Surgery to reverse surgical sterilization procedures.


**Prescription Drug Program:**

Expenses for the following are excluded and/or limited:

A.   Rogaine (minoxidil) for hair restoration or any other drug used primarily for cosmetic purposes.
B.   Retin-A cream and ointment is covered only for acne treatment, and only if "medically necessary" is indicated on the prescription by the prescriber.
C.   Accutane is covered only if "medically necessary" is indicated on the prescription by the prescriber.
D.   All medicinal substances that may be dispensed without a prescription, excluding insulin.
E.   Therapeutic devices or appliances, including but not limited to support garments and other non-medical substances.
F.   All drugs bearing a label: "Caution - limited by federal law to investigational use" or experimental drugs as determined by The Food and Drug Administration.
G.   The refilling of a prescription in an amount greater than that authorized by the prescriber.
H.   Immunization agents and biological serum, blood, or blood products.
I.   Diet medications or medications prescribed for weight control, unless approved through the Clinical Review Process.
J.   The refilling of a prescription after one (1) year from the date of issuance.
K.   The filling or refilling of prescriptions not in compliance with applicable state and federal law, rules, and regulations.
L.   Quantities in excess of a thirty(30) day supply unless approved for the Maintenance Drug Program.
M.   Prescription drugs which may be properly received without charge under local, state, or federal programs, including Worker's Compensation.
N.   Viagra or any product for the diagnosis of impotence.
O.   Any drug used in the treatment of a non-covered service under this Plan.
P.   Legend vitamins (non-prenatal).
Q.   Growth hormones unless approved through the Clinical Review Process.

## PART VI

### Pre-Authorization/Utilization Management Program

If a network physician recommends hospitalization or certain elective outpatient services, the physician or Covered Person must obtain prior authorization from the designated Utilization Management Provider. If the Member is in the PPO Plan and utilizes a non-network physician, it is the Member's responsibility to make certain pre-authorization is obtained. The request must be submitted five (5) working days prior to scheduling the service (except maternity cases). The Utilization Management Provider will review the medical information and the planned procedures for appropriateness. Surgery is to be performed the same day as admission unless there are extenuating clinical conditions to the contrary and if specifically authorized by the Utilization Management Provider.

The pre-authorization procedure must take place prior to non-emergency services. If admission is due to an emergency, the Covered Person and hospital staff or the attending physician must call the designated Utilization Management Provider within forty-eight (48) hours following the admission. Concurrent review will be performed during the hospitalization.

The Utilization Management program is mandatory. It is the responsibility of in-network providers to initiate and complete the pre-authorization process. If the procedure is to be performed by an out-of-network provider, it is the responsibility of the Covered Person to initiate and complete the pre-authorization process. If any admissions, outpatient services and/or elective surgeries on the enclosed list are not pre-certified, the resulting charges <u>may not be covered, coverage may be reduced, or the Covered Person may incur a financial penalty</u>.

For non-emergency services reviewed in advance, written notification is sent to the patient, the physician, and the hospital confirming the certified course of treatment.

The Plan will not cover Friday, Saturday, or Sunday room and board expenses due to admission, unless such care is for an emergency admission due to an illness or injury, admission is due to pregnancy or childbirth or the admission was pre-authorized for that day.

#### Pre-authorization List

The following procedures must be pre-authorized prior to services being rendered.
This list is subject to change at anytime.

**All Out-of-Network and Out-of-Area Services** of any kind (HMO/EPO only)

1. **All in-patient admissions**, including acute care, sub-acute, rehab, and SNF
2. **All home health care**, including home uterine monitoring and infusion therapy
3. **All DME and Prosthetics over $250**
4. **Global Obstetric Care**
5. **MRI and Pet Scans**
6. **Physical, Speech, and Occupational Therapies**
7. **Oral Surgery**
8. **Infertility Services**
9. **Out-patient, Facility-Based Surgeries**

10. **Sleep Studies**
11. **Transplants**

## Medical Case Management:

A.    Case Management will be utilized when a Covered Person has suffered a severe personal injury or illness. All such charges must be incurred while such person is covered by the Plan. The amount of such benefits will be determined by the Plan, based on the recommendations of the Utilization Management Provider. Any agreement to pay benefits as above will be based on an objective review of

1. The medical status
2. The current treatment plan
3. The projected treatment plan
4. The long-term cost implications
5. The appropriateness of care
6. Rehabilitation potential

B.    As used above, "a severe personal injury or illness" includes, but is not limited to, the following: major brain injury or intracranial neoplasm, spinal cord injury, amputations, multiple fractures, severe burns, neonatal high-risk infants, severe stroke, multiple sclerosis, amyotrophic lateral sclerosis, organ transplantation, end-stage cancer, acquired immune deficiency syndrome, Guillain-Barre' syndrome, and severe auto-immune diseases.

**PART VII**

**PRE-EXISTING CONDITIONS AND CERTIFICATES OF CREDITABLE COVERAGE**

### VII.1  Pre-Existing Conditions:

Services are excluded for pre-existing conditions that relate to a physical or mental condition, regardless of the cause of the condition for which medical advice, diagnosis, care, or treatment was recommended or received, within the six(6) month period ending on the Enrollment Date. Medical advice, diagnosis, care, or treatment is taken into account only if it is recommended by or received from an individual licensed or similarly authorized to provide such services under State law and operating within the scope of practice authorized by State law.

The pre-existing condition exclusion extends for twelve(12) months for individuals enrolled during the Initial, Special, and Late Enrollment Periods. The twelve (12) month exclusion begins on the Enrollment Date for those enrolling in the Initial Enrollment or Special Enrollment Periods. For individuals enrolling during the Late Enrollment Period, the exclusion period begins on the Benefit Eligibility Date. The exclusion period ends on the twelve(12) month anniversary of the Enrollment Date and Benefit Eligibility Date respectively.

The pre-existing condition exclusion does not apply to newborn children, adopted children or children placed for adoption, or pregnancies.

The period of any pre-existing condition exclusion is reduced by the number of days of creditable coverage the covered person has as of the Enrollment Date, if no significant break in coverage exists. If a significant break in coverage does not exist, creditable coverage will be counted if previous coverage was continuous to a date not more than sixty-three (63) consecutive days prior to the Covered Person's Enrollment Date. Creditable coverage will be applied to previous group health plans, government sponsored health plans, and individual health insurance plans that comply with HIPAA regulations.

## VII.2  Issuance of Certificate of Creditable Coverage

A certificate of creditable coverage will be provided without charge upon request to covered employees and their eligible dependents when coverage under the health plan ceases.

Written certificates of creditable coverage will be issued to individuals for the following events:

A. COBRA Qualified Beneficiaries upon a Qualifying Event
B. Covered Persons when coverage ceases
C. COBRA Qualified Beneficiaries when COBRA ceases

Certificates of creditable coverage will be sent by first-class mail within a reasonable time to the covered person's last known address. The certificates will also include information regarding eligible dependents.


## PART VIII

## DUPLICATION OF COVERAGE UNDER OTHER HEALTH PLANS/PROGRAMS

### VIII.1  Benefits Subject to This Provision:

All of the benefits under this Plan with respect to expenses incurred on or after the day this provision becomes effective are subject to this provision.

### VIII.2  Coordination of Benefits:

A. The Third Party Administrators shall coordinate payment of benefits with respect to claims under group health insurance policies and plans having Coordination of Benefits provisions in accordance with the provisions of 627.4235(4), Florida Statutes. Coordination of Benefits is applied when a Covered Person is also covered under other contracts or programs providing health care benefits that contain a Coordination of Benefits provision. Such other contracts may include, but are not limited to, the following:

1. Any group insurance, group-type self-insurance, or HMO plan;

2. Any plan, program, or insurance policy including an automobile insurance policy;

3. Any plan, program or insurance established pursuant to Worker's Compensation or other legislation of similar purpose.

Payment is based on whether this Plan is the primary or secondary payor. When primary, this Plan will provide or pay benefits for covered services without regard to the Covered Person's coverage under other contracts providing health care benefits. When secondary, the benefits this Plan pays for covered services may be reduced so that, when combined with the reasonable cash value of the Covered Person's primary benefits, total payment under both policies will not exceed 100% of the total usual, customary, and reasonable expenses actually incurred. However, expenses due to non-compliance with applicable state law or policy provisions of the primary carrier shall not affect this Plan's reduced level of liability. Payment will be made as if applicable laws and policy provisions were adhered to. The Pre-certification/Utilization Management Program applies, even when secondary, and may be applied retroactively.

B. When this Plan pays secondary to Medicare, the following rules will apply:

   1. No deductible applies to Part A inpatient hospital-related allowable Medicare charges. The Part A inpatient hospital deductible is to be reimbursed at 100% of the allowable.

   2. The calendar year deductible is applied to Medicare Part B coverage and additional allowable expenses under the plans.

C. The rules establishing the order of benefit determination between this Plan and any other plan covering the Covered Person on whose behalf a claim is made are as follows:

   1. The benefits of a Plan which does not have a Coordination of Benefits provision shall in all cases be applied before the benefits under this Plan.

   2. When this Plan covers the Covered Person as a dependent and the other plan covers the Covered Person as other than a dependent this Plan will be secondary.

   3. When this Plan covers a dependent child whose parents are not separated or divorced:

      a. The coverage of the parent whose birthday falls earlier in the year will be considered primary;

      b. If both parents have the same birthday and the other plan has covered one of the parents longer, this Plan will be secondary.

   4. When this Plan covers a dependent child whose parents are separated or divorced:

> a. If the parent with custody is not remarried, the coverage of the parent with custody is primary;
>
> b. If the parent with custody has remarried, the coverage of the parent with custody is primary, the step-parent's coverage is secondary, and the coverage of the parent without custody pays last;
>
> c. Regardless of which parent has custody, whenever a court decree specifies the parent who is financially responsible for the child's health care expenses, the coverage of that parent is primary.

5. When this Plan covers the Covered Person as a dependent child and the other contract covers the Covered Person as a dependent child:

> a. The coverage of the parent who is neither laid off nor retired will be considered primary;
>
> b. If the other policy or plan is not subject to this rule, and if, as a result, the policies or plans do not agree on the order of benefits, this paragraph shall not apply.

6. When rules 1, 2, 3, 4, and 5 above do not establish an order of benefits, the plan that has covered the Covered Person the longest shall be primary.

### VIII.3  Right to Receive and Release Necessary Information:

For the purpose of determining the applicability and implementing the terms of this provision of this Plan or any provision of similar purpose of any other Plan, the Third Party Administrators may, without the consent of or notice to any person, release to or obtain from any other insurance company or other organization or person any information, with respect to any person, which the Party Administrators deem to be necessary for such purposes. Any person claiming benefits under this Plan shall furnish to the Third Party Administrators such information as may be necessary to implement this provision.

### VIII.4  Facility of Payment:

Whenever payments which should have been made under this Plan in accordance with this provision have been made under any other coverage, the Third Party Administrators shall have the right, exercisable alone and in its sole discretion, to pay over to any organization making such other payments any amounts they shall determine to be warranted in order to satisfy the intent of this provision. Amounts so paid by the Third Party Administrators shall be deemed to be benefits paid under this Plan and, to the extent of such payments, the Third Party Administrators shall be fully discharged from liability under this Plan.

### VIII.5  Right of Recovery:

Whenever payments have been made by the Third Party Administrators with respect to allowable expenses in a total amount, at any time, in excess of the maximum amount of

payment necessary at that time to satisfy the intent of this provision, the Third Party Administrators shall have the right to recover such payments, to the extent of such excess, from among one or more of the following, as the Third Party Administrators shall determine: any persons to, or for, or with respect to whom such payments were made; any other insurance companies; any other organizations, or any future benefits due.

## VIII.6 Effect of Medicare on Benefits for Active Employees:

If a person insured under this Plan for medical care benefits is also eligible for Medicare benefits

A. Due to end stage renal disease, this Plan will determine its benefits without taking into account Medicare benefits for which that person is eligible, during the first thirty (30) consecutive months that person is eligible for Medicare benefits.

B. Due to any other disability, or due to attainment of age sixty-five (65), this Plan will determine its benefits without taking into account Medicare benefits for which that person is eligible.

## VIII.7 Effect of Medicare on Benefits for Retired Employees:

### *THIS PLAN WILL BE SECONDARY TO MEDICARE.*

All retired employees and their spouses age sixty-five (65) or over and disabled retirees who are eligible for Medicare shall have Medicare as the primary payor and this Plan shall be secondary. Medicare-eligible retirees are required to show proof of Medicare Part B enrollment. Medicare-eligible retirees must **not** enroll in Medicare Part D.

## PART IX

## CLAIMS PROCEDURES AND ADMINISTRATION

**IX.1** The Third Party Administrators shall be CIGNA HealthCare of Florida, Walgreens Health Initiatives, or BlueCross BlueShield of Florida. A new Third Party Administrator may be named from time to time by the Employer. Covered Employees will receive notice of such change within ten (10) days of its effective date.

**IX.2** The Employer shall pay to or for the benefit of Covered Persons the in-network benefits described in Part III. All claims will be submitted to, processed by, and, if approved, paid by the Third Party Administrators within thirty (30) days of receipt. Covered Persons are responsible for making accurate insurance information available to their in-network providers.

**IX.3** The filing limit for submission of out-of-network PPO Plan claims is one (1) year from the date of service. Members utilizing out-of-network providers are responsible to ensure claims have been filed within the one year filing limit. Failure to submit claims within specified submission times will result in denial of the claim. Members can be held financially responsible for out-of-network claims that are not filed in a timely manner.

- 44 -

IX.4    If any claims for benefits under this Plan are denied in whole or in part, the claimant shall be furnished written notice promptly by the appropriate Third Party Administrator

A.  Setting forth the reason for denial;
B.  Describing any additional material or information needed from the claimant and why; and
C.  Explaining the claim review procedure set forth herein.

Failure by the appropriate Third Party Administrator to respond to a claim within ninety (90) days shall be deemed a denial. Within sixty (60) days after the denial of any claim for benefits under this Plan, the claimant may request in writing a review of the denial from the appropriate Third Party Administrator. Any claimant seeking a review hereunder is entitled to examine all pertinent documents and to submit issues and comments in writing. The appropriate Third Party Administrator shall render a decision on review of a claim not later than sixty (60) days after receipt of a request for review hereunder. The decision shall be in writing and shall state the reason for the decision, referring to the Plan provisions upon which it is based.

Should the decision be unsatisfactory, the claimant may appeal under the grievance procedure by contacting the member services of the appropriate third party administrator.

1.  BlueCross BlueShield of Florida if enrolled in the BlueCare HMO or BlueChoice PPO;
2.  CIGNA HealthCare of Florida if enrolled in the CIGNA EPO, PPO, or Basic Plan;
3.  Walgreens Health Initiatives for pharmacy claims.

See plan identification cards for member services telephone number.

If a Medical Child Support Order is deemed "Qualified" by the Plan Sponsor, the Plan Sponsor will forward the appropriate Alternate Recipient in accordance with the order. That is, benefits will be paid to the Alternate Recipient, custodial parent, or legal guardian, as appropriate. If the Alternate Recipient, custodial parent, or legal guardian assigns benefits, they will be paid to the health care provider.

## PART X

## SUBROGATION RIGHTS

X.1    In the event of any payment under the Plan to any Covered Person, the Plan shall, to the extent of such payment, be subrogated, unless otherwise prohibited by law, to all the rights of recovery of the Covered Person arising out of any claim or cause of action which may accrue because of alleged negligent conduct of a third party.

Any such Covered Person hereby agrees to reimburse the Plan for any payments so made hereunder out of any monies recovered from such third party as the result of judgment, settlement, or otherwise, and such Covered Person hereby agrees to take such action to furnish such information and assistance, and to execute and deliver all

necessary instruments as the Plan Sponsor may require to facilitate the enforcement of the Plan's rights and not to prejudice such rights. Such subrogation rights shall extend only to the recovery by the Employer of the benefits it has paid for such medical and/or dental expenses. Such recovery can be made through any settlement, including pain and suffering, judgment, or otherwise, whether or not the claimant is a Covered Person in the Plan. The Employer shall pay fees and costs associated with the enforcement of the Plan's rights.

## PART XI

## AMENDMENTS AND WAIVERS

Any amendments to this Agreement shall be in writing and must be approved and executed by the Plan Sponsor and The Brevard Public Schools' Benefit Plan. The Plan specifically reserves the right to amend the Group Plan upon thirty (30) days notice to the Plan Sponsor and Third Party Administrators. Such amendment shall be final and binding. No agent of the Plan Sponsor has the authority to change this Agreement or waive any of its provisions or restrictions.

## PART XII

## CLERICAL ERROR

Clerical error, whether by The Brevard Public Schools' Benefit Plan, Plan Sponsor, or the Third Party Administrators, in keeping any record pertaining to the coverage under this Agreement, will not invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated.

## PART XIII

## APPLICABLE LAW

The laws applicable to self-insured trusts shall govern this Agreement.

## PART XIV

## INCONSISTENCY

In the event of any inconsistency between this Summary Plan Description and any other printed material distributed by either the Third Party Administrators or Brevard Public Schools, the terms of this Summary Plan Description shall govern.

## PART XV

## FRAUD, WASTE, AND ABUSE

Attempts to defraud, waste, or abuse the benefits, services, and provisions provided by this plan will result in the discontinuation of coverage and may result in severance of employment in the case of active employees or their dependents.

## Part XVI

## GRIEVANCE PROCEDURE

### Effective Date Revised – January 1, 2007

Brevard Public Schools has established a grievance procedure which follows a confidential method of hearing and resolving grievances between or among covered persons participating in the School's health benefit plans (Plans). The grievance procedure was also established to deal with other problems as may arise under the Plan. This process is designed to transmit participant grievances to the appropriate decision-making levels within the Plan. The representatives of Brevard Public Schools have the authority to take corrective action and resolve the problem only to the extent permissible within the Plan Document.

**NOTE:    The Grievance Procedure differs slightly from one Plan to another. Please utilize the appropriate procedure for the Plan you are enrolled in.**

### CIGNA Basic, EPO and PPO Plans
### BlueCross BlueShield BlueChoice (PPO) Plan

### Step I

The Member should first attempt to resolve the problem or dispute directly with member services.

| | |
|---|---|
| CIGNA's Member Services | 800-244-6224 |
| BCBSFL Member Services | 800-352-2583 |

### Step II

If the response at Step I did not resolve the problem, contact your plan administrator in writing:

> CIGNA HealthCare
> Appeals Department
> P.O. Box 182223
> Chattanooga, TN 37422
>
> BCBSFL
> PPO Appeals Department
> P.O. Box 44197
> Jacksonville, FL  32231-4197

State the nature of the problem or complaint and include the name of the person(s) involved, date of occurrence, location, and other pertinent information. The Plan Administrator will conduct an investigation, and make an effort to resolve the problem. Pertinent benefit information specifically related to the problem will be communicated to the Member.

Your Plan Administrator will respond in writing with a decision within 60 days. If more time or information is needed to make the determination, the Member will be notified in writing to request an extension. The Member may request the appeal process be expedited if, (a) the time frame under this process would seriously jeopardize the Member's life, health or ability to regain maximum functionality or in the opinion of the Member's physician, would cause severe pain which cannot be managed without the requested services; or (b) the appeal involves non-authorization of an admission or continuing inpatient hospital stay. The Plan Administrator's physician reviewer, in consultation with the treating physician will decide if an expedited appeal is necessary. When an appeal is expedited, the Plan Administrator will respond within 72 hours.

**Step III.**

If a mutually satisfactory conclusion cannot be reached at Step II, the Member may present his or her position, in writing, to:

> Janice S. Bush, CEBS
> Senior Vice President/COO
> RobinsonBush, Inc.
> 37 N. Orange Avenue, Suite 500
> Orlando, FL 32801

The written appeal of the Member must contain the written response from the Plan Administrator as well as factual information on the areas where the Member disagrees with the response received.

Upon receipt of a written request for final consideration, RobinsonBush shall:

1. Acknowledge receipt to participant;
2. Thoroughly review pertinent facts of the case;
3. Obtain opinion from disinterested third party;
4. Provide written final determination of the matter.

The decision of RobinsonBush is final.

## BlueCross BlueShield of Florida BlueCare Plan (HMO)

Complaints and appeals for the BCBSFL BlueCare Plan (HMO) will be handled by Health Options, Inc. (HOI).

### Step I

Contact an HOI Customer Service Representative at the number listed on your Membership Card, or the number listed below:

HOI Customer Service:  877-352-2583

The Customer Service Representative will review the Complaint within a reasonable time frame and attempt to resolve it to your satisfaction.

### Step II

If the response at Step I did not resolve the problem, you may submit a Formal Grievance by following the steps below:

Request a Grievance form from Customer Service by calling the Customer Service Number on your Membership Card.  Note:  You are not *required* to submit your grievance on this form, and may simply write a letter, but utilizing the form will facilitate the process.  Mail the form and any relevant documentation to:

> Health Options, Inc.
> Attention:  Grievance and Appeals Department
> 4800 Deerwood Campus Parkway DCC4-1
> Jacksonville, FL  32246

State the nature of the problem or complaint and include the name of the person(s) involved, date of occurrence, location, and other pertinent information.  The Local Office Grievance Committee will review the Grievance and advise you of its decision in writing within 30 days.  You may request an expedited review by calling the Customer Service Department and stating, "I want an expedited review."  The following conditions must be in place for an expedited review to be granted:  (a) You must be dissatisfied with a prior benefit determination, (b) A delay in care could seriously jeopardize your life or health, (c) The health care provider involved has refused to provide the needed service without a guarantee of coverage.  A benefit determination will be communicated to you or your provider within 72 hours.

**Step III**

If the decision reached in Step II is not satisfactory, you may request a Corporate Office Review *within 30 days* of receiving the decision.  You must submit your request in writing to:

>           Health Options, Inc
>           Grievance and Appeals Department
>           ATTN:  Patti Moore
>           4800 Deerwood Campus Parkway DCC4-1
>           Jacksonville, FL  32246

HOI's Corporate Office will review the Local Office decision as quickly as possible and advise the Member of its decision in writing.  HOI will resolve the Member's Grievance within a total of 30 days after receipt for Pre-Service Claims, or within 60 days for the Post-Service Claims.

**Step IV.**

If a mutually satisfactory conclusion cannot be reached at Step III, the Member may present his or her position, in writing, to:

>           Janice S. Bush, CEBS
>           Senior Vice President/COO
>           RobinsonBush, Inc.
>           37 N. Orange Avenue, Suite 500
>           Orlando, FL  32801

The written appeal of the Member must contain the written response from HOI as well as factual information on the areas where the Member disagrees with the response received.

Upon receipt of a written request for final consideration, RobinsonBush shall:

1. Acknowledge receipt to participant;
2. Thoroughly review pertinent facts of the case;
3. Obtain opinion from disinterested third party;
4. Provide written final determination of the matter.

The decision of RobinsonBush is final.


**If you experience a problem with Pharmacy or Behavioral Health, please contact them in writing at:**

Walgreens Health Initiatives
7680 Universal Blvd., Suite 460
Orlando, FL  32819

Bradman/Unipsych Companies
Denise Scott, Grievance Coordinator
7777 Davie Rd., Suite 100
Hollywood, FL  33024

If a mutually satisfactory conclusion cannot be reached, the Member may present his or her position, in writing, to:

> Janice S. Bush, CEBS
> Senior Vice President/COO
> RobinsonBush, Inc.
> 37 N. Orange Avenue, Suite 500
> Orlando, FL  32801

The written appeal of the Member must contain the written response from WHI or Bradman/Unipsych as well as factual information on the areas where the Member disagrees with the response received.

Upon receipt of a written request for final consideration, RobinsonBush shall:

1. Acknowledge receipt to participant;
2. Thoroughly review pertinent facts of the case;
3. Obtain opinion from disinterested third party;
4. Provide written final determination of the matter.

The decision of RobinsonBush is final.

## PART XVII

### RESPONSIBILITIES FOR PLAN ADMINISTRATION AND AGREEMENT PAGE

Brevard Public Schools is the "Plan Sponsor" and has retained the services of four (4)independent Third Party Administrators, experienced in claims processing, to process claims and administer the retiree plan.

| | |
|---|---|
| **Plan Sponsor:** | Brevard Public Schools |
| **Type of Plan:** | Self-funded Welfare Plan providing health benefits |
| **Type of Administration:** | Contract administration with Third Party Administrators |
| **Address of Plan:** | 2700 Judge Fran Jamieson Way<br>Viera, Florida 32940-6699<br>(407) 633-1000 |
| **Federal Tax ID Number:** | 59-6000052 |
| **Plan Effective Date:** | January 1, 2000 |
| **Plan Renewal Date:** | Annually |
| **Named Fiduciary:** | Brevard Public Schools |
| **Agent for Services of Legal Process:** | Brevard Public Schools |
| **Plan Third Party Administrator:** | CIGNA HealthCare of Florida<br>or<br>BlueCross BlueShield of Florida<br>or<br>Walgreens Health Initiatives<br>or<br>Bradman/Unipsych |

The Plan Sponsor assumes the sole responsibility for funding the employee benefits. State law governing guarantee funds may not cover benefits payable under the Plan if the Plan Sponsor is unable to pay benefits. The Plan Sponsor has purchased excess risk insurance coverage which is intended to reimburse the Plan Sponsor for certain losses incurred and paid under the Plan by the Plan Sponsor. The excess risk insurance coverage is not part of the Plan.

This document and any amendments constitute the Summary Plan Document for the Employer's benefit plan.

The requirements for being covered under this Plan, the provisions concerning termination of coverage, a description of the Plan benefits, and the procedures to be following in presenting

claims for benefits and remedies available for appeal of claims denied are outlined in this Summary Plan Document.

The Employer intends to maintain this Plan indefinitely; however, it reserves the right, at any time, to amend, suspend, or terminate the Plan in whole or in part without advance notice. If the Plan is amended, members may be entitled to receive different benefits or benefits under different conditions. If the Plan were terminated, all benefit coverage would end. This may happen at any time, and in no event will members become entitled to any vested rights under this Plan.

**PART XVIII**

**HIPAA PRIVACY PROCEDURES**

Pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and its implementing regulation, the Standard for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82,461 et seq. (December 28, 2000), Brevard Public Schools has developed the following procedures:

**Purpose:**  The following privacy procedure has been implemented to ensure that Brevard Public Schools complies fully with all federal privacy protection laws and regulations. Protection of patient privacy is of paramount importance to Brevard Public Schools. Violations of any of these provisions will result in severe disciplinary action including termination of employment and possible referral for criminal prosecution.

This procedure remains in effect until superseded or cancelled.

**Effective Date:**  This procedure is in effect as of April 14, 2003.

**Uses and Disclosures of Protected Health Information**

This procedure specifies that protected health information may not be used or disclosed except when at least one of the following conditions is true:

1.     The individual who is the subject of the information (i.e. the "subject individual") has authorized, in writing, the use or disclosure. A properly executed, signed Authorization For Release Of Health Information is required for all requests to release information for purposes not covered in numbers 2 through 5 below.

2.     The individual who is the subject of the information has consented, in writing, to the use or disclosure and the use or disclosure is for treatment, payment, or health care operations.

3.     The individual who is the subject of the information does not object to the disclosure, and the disclosure is to persons involved in the health care of the individual or for facility directory purposes.

4.     The disclosure is to the individual who is the subject of the information or to the federal Department of Health and Human Services for compliance-related purposes.

5.    The use or disclosure is for one of the HIPAA "public purposes" (e.g. required by law).

**Deceased Individuals**
These privacy protections extend to information concerning deceased individuals.

**Notice of Privacy Practices**
A Notice of Privacy Practices has been published. This notice and any subsequent revisions thereto will be provided to all subject individuals at the earliest practicable time. All uses and disclosures of protected health information shall be done in accord with this Notice of Privacy Practices.

**Restriction Requests**
Serious consideration must be given to all requests for restrictions on uses and disclosures of protected health information as published in the Notice of Privacy Practices. If a particular restriction is agreed to, then this organization is bound by that restriction. Requests for protected health information restrictions are filed with the CPO (Chief Privacy Officer) using an Individual Request Not to Use or Disclose Health Information form.

**Minimum Necessary Disclosure of Protected Health Information**
Except for disclosures made for treatment purposes, all disclosures of protected health information must be limited to the minimum amount of information needed to accomplish the purpose of the disclosure. All requests for protected health information (except requests made for treatment purposes) must be limited to the minimum amount of information needed to accomplish the purpose of the request.

**Access to Protected Health Information**
Access to protected health information must be granted to each employee or contracted vendor based on the assigned job functions of the employee or contracted vendor. Access privileges should not exceed those necessary to accomplish the assigned job function.

**Access to Protected Health Information by the Subject Individual**
Access must be granted by the person who is the subject of such information, in writing, when such access is requested for uses other than treatment and payment of health care operations. Authorization must be filed with the CPO using a correctly-executed Individual Request to Inspect Health Information. Individuals have the right to request access to their own information that is maintained in a "designated record set." A designated record set includes personally identifiable information such as medical records, billing records, enrollment, payment, claims adjudication and health plan case or medical management records systems or records used to make decisions about individuals. In response to a request to access health information, the District must respond in writing as to whether or not the request has been granted or denied. If access is denied, the reason must be stated. If access is granted, the District has up to 60 days to provide access. Brevard Public Schools' Response to Inspection Request form is used to notify the requester.

**Amendment of Incomplete or Incorrect Protected Health Information**
Incorrect protected health information will be corrected in a timely fashion. Notice of these corrections will be given to any organization with which the incorrect information has been shared. A request to amend Personal Health Information (PHI) must be made in writing using the Individual Request to Correct or Amend A Record form. The District must respond to such

a request with 60 calendar days or request an extension with good reason to do so. The District will respond in writing using the Response to Amendment or Correction Request form.

**Access by Personal Representative**
Access to protected health information may be granted to personal representatives of subject individuals as specified by subject individuals. The subject individual must make his or her designation of a personal representative in writing using the Designation of a Personal Representative To Access Health Information form.

**Confidential Communications Channels**
Confidential communications channels shall be used, as requested by subject individuals, to the extent possible.

**Disclosure Accounting**
An accounting of all disclosures of protected health information shall be given to subject individuals whenever such an accounting is requested in writing using an Individual Request to Inspect Health Information form.

**Complaints**
All complaints relating to the protection of health information shall be investigated and resolved in a timely fashion. Complaints must be filed with the CPO, in writing. The District will respond or request an extension of the timeframe within 60 calendar days of receipt of the complaint.

**Prohibited Activities**
No employee or contracted vendor may engage in any intimidating or retaliatory acts against persons who file complaints or otherwise exercise their rights under HIPAA regulations. It is also the policy of this organization that no employee or contractor may condition treatment, payment, enrollment, or eligibility for benefits on the provision of an authorization to disclose protected health information.

**Responsibility**
Responsibility for designing and implementing procedures on the privacy of Protected Health Information lies with the CPO.

**Verification of Identity**
The identity of all persons who request access to protected health information must be verified before such access is granted. All employees who have access to Personal Health Information as part of their job description will be identified and trained in these procedures. In order to have access to PHI in course of their job duties with Brevard Public Schools, such employees must execute an Employee Confidentiality Agreement. Failure to do so may result in disciplinary action up to and including termination of employment.

**Mitigation**
The effects of any unauthorized use or disclosure of protected health information shall be mitigated to the extent possible.

**Business Associates**

Business associates of Brevard Public Schools must be contractually bound to protect health information to the same degree as set forth in this procedure. A business associate is defined as

(1)  Any person or organization that performs or assists in performing a function or activity involving PHI use or disclosure on behalf of a covered entity (or an organized health care arrangement). These covered functions include

- Claims processing or administration
- Data analysis
- Processing or administration
- Utilization review
- Quality assurance
- Billing
- Benefit management
- Practice management, and
- Re-pricing

(2)  Any person or organization that provides one of the following services to or for a covered entity if the service involves a PHI disclosure from a covered entity or organized health care arrangement (or their business associate) to that person, including

- Legal
- Actuarial
- Accounting
- Consulting
- Data aggregation
- Management
- Administrative
- Accreditation, or
- Financial services.

**Cooperation with Privacy Oversight Authorities**

Oversight agencies such as the Office for Civil Rights of the Department of Health and Human Services shall be given full support and cooperation in their efforts to ensure the protection of health information. All personnel must cooperate fully with all privacy compliance reviews and investigations.

### Important Notice to Retirees from Brevard Public Schools About Your Prescription Drug Coverage and Medicare

Please read this notice carefully and keep it where you can find it. This notice has information about your current prescription drug coverage with Brevard Public Schools and prescription drug coverage available for people with Medicare. It also explains the options you have under Medicare prescription drug coverage and can help you decide whether or not you want to enroll. At the end of this notice you will find information about where you can get help in making decisions about your prescription drug coverage.

1. Medicare prescription drug coverage became available in 2006 to everyone with Medicare through Medicare prescription drug plans and Medicare Advantage Plans that offer prescription drug coverage. All Medicare prescription drug plans provide at least a standard level of coverage set by Medicare. Some plans may also offer more coverage for a higher monthly premium.

2. Brevard Public Schools has determined that the prescription drug coverage offered by the Schools is, on average for all plan participants, expected to pay out as much as the standard Medicare prescription drug coverage will pay and is considered Creditable Coverage.

---

*Because your existing coverage through Brevard Public Schools is on average at least as good as standard Medicare prescription drug coverage, you can keep your coverage and not pay extra if you later decide to enroll in Medicare prescription drug coverage.*

Individuals can enroll in a Medicare prescription drug plan when they first become eligible for Medicare and each year from November 15th through December 31st. Beneficiaries leaving employer/union coverage may be eligible for a Special Enrollment Period to sign up for a Medicare prescription drug plan.

You should compare your current coverage, including which drugs are covered, with the coverage and cost of the plans offering Medicare prescription drug coverage in your area.

*If you do decide to enroll in a Medicare prescription drug plan and drop your Brevard Public Schools prescription drug coverage, be aware that you and your dependents will not be able to get this coverage back.*

**Please contact us for more information about what happens to your coverage if you enroll in a Medicare prescription drug plan.**

You should compare your current coverage, including which drugs are covered, with the coverage and cost of the plans offering Medicare prescription drug coverage in your area.

The Brevard Public Schools plan provides comprehensive prescription drug coverage through retail and mail order providers. During 2007, copayments for the Brevard Public Schools prescription drug benefit are:

|  | Generic | Preferred Brand | Non-Preferred Brand |
|---|---|---|---|
| Retail 30 Days | $10 | $20 | $35 |
| Retail Advantage 90 | $20 | $40 | $70 |
| Mail Order 90 | $20 | $40 | $70 |

In addition, your current Brevard Public Schools coverage pays for other health expenses, in addition to prescription drugs, and you **will not** be eligible to receive all of your current health and prescription drug benefits if you choose to enroll in a Medicare prescription drug plan.

You should also know that if you drop or lose your coverage with Brevard Public Schools and don't enroll in Medicare prescription drug coverage after your current coverage ends, you may pay more (a penalty) to enroll in Medicare prescription drug coverage later.

If you go 63 days or longer without prescription drug coverage that is at least as good as Medicare's prescription drug coverage, your monthly premium will go up at least 1% per month for every month that you did not have that coverage. For example, if you go nineteen months without coverage, your premium will always be at least 19% higher than what many other people pay. You'll have to pay this higher premium as long as you have Medicare prescription drug coverage. In addition, you may have to wait until the following November to enroll.

For more information about this notice or your current prescription drug coverage…

Contact our office at 321-633-1000. NOTE: You will receive this notice annually and at other times in the future such as before the next period you can enroll in Medicare prescription drug coverage, and if this coverage through Brevard Public Schools changes. You also may request a copy at any time.

For more information about your options under Medicare prescription drug coverage…

More detailed information about Medicare plans that offer prescription drug coverage is in the "Medicare & You" handbook. You'll get a copy of the handbook in the mail every year from Medicare. You may also be contacted directly by

Medicare prescription drug plans. For more information about Medicare prescription drug plans:

- Visit www.medicare.gov
- Call your State Health Insurance Assistance Program (see your copy of the Medicare & You handbook for their telephone number) for personalized help,
- Call 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048.

For people with limited income and resources, extra help paying for Medicare prescription drug coverage is available. Information about this extra help is available from the Social Security Administration (SSA) online at www.socialsecurity.gov, or you call them at 1-800-772-1213 (TTY 1-800-325-0778).

---

**Remember:  Keep this notice.  If you enroll in one of the new plans approved by Medicare which offers prescription drug coverage, you may be required to provide a copy of this notice when you join to show that you are not required to pay a higher premium amount.**

---

|  |  |
|---|---|
| Date: | May 15, 2006 |
| Name of Entity/Sender: | Brevard Public Schools |
| Contact--Position/Office: | Benefits Department |
| Address: | 2725 Judge Fran Jamieson Way, Bldg. B, Viera, FL 32940 |
| Phone Number: | 321-633-1000 |

## AGREEMENT PAGE

**Group Name:**      **THE BREVARD PUBLIC SCHOOLS**

**Effective Date:**      **JANUARY 1, 2000**

**Revised Date:**      **JANUARY 1, 2007**

**EFFECTIVE DATE AND TERM OF AGREEMENT:** The Agreement shall be effective on the 1st day of January 2007 at 12:01 a.m. Eastern Standard Time. It is agreed by the Plan Sponsor that the provisions contained herein and amendments thereto are acceptable and will be the basis for the administration of said Employer's Benefit Program.

Signed at Viera, Florida this \_\_\_\_\_ day of_____, 1999.

BREVARD PUBLIC SCHOOLS

By: _____

Title: _____

WITNESS

By: _____

Title: _____

EXHIBIT 2

# ADMINISTRATIVE SERVICES AGREEMENT

### between

## BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.

### and

## HEALTH OPTIONS, INC.

### and

## BREVARD PUBLIC SCHOOLS

This Administrative Services Agreement (hereinafter referred to as the "Agreement"), made this 1st. day of January_____, 2007, is by and between Blue Cross and Blue Shield of Florida, Inc., a Florida corporation having its principal place of business at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246 (hereinafter referred to as the "BCBSF AND HOI"), Health Options, Inc. (hereinafter referred to as the "HOI") and  Brevard Public Schools located at 2700 Judge Fran Jamieson Way, Viera, Florida 32940-6699 (hereinafter referred to as the "Employer").

WHEREAS, the Employer has established and currently sponsors a self-insured Employee Welfare Benefit Plan, to provide certain benefits (attached hereto as Exhibit "A" and hereinafter called the "Group Health Plan") for covered group members and their covered dependents; and

WHEREAS, except as otherwise specifically provided herein, the Employer is to retain all liabilities under its Group Health Plan, and BCBSF AND HOI is to provide the agreed upon  services to the Group Health Plan without assuming any such liability; and

WHEREAS, the Employer desires that, with respect to the Group Health Plan, BCBSF AND HOI furnish certain claims processing and administrative services.

NOW, therefore, in consideration of the mutual promises contained herein, and other good and valuable consideration, the parties agree as follows:    /

### SECTION I

### TERM

1.1    Initial Term

The initial term of this Agreement shall be from January 1, 2007 (the effective date) and shall end on December 31, 2007 (the termination date),

1

unless the Agreement is terminated earlier in accordance with the provisions of this Agreement.

1.2   Renewal Terms

This Agreement will automatically renew each anniversary date for successive one year terms at the renewal rates then in effect, unless either party notifies the other party of its intent not to extend this Agreement at least 30 days prior to the applicable anniversary date.

## SECTION II

## DUTIES AND RESPONSIBILITIES OF THE EMPLOYER

2.1   Final Authority

The Employer retains all final authority and responsibility for the Group Health Plan including, but not limited to eligibility and enrollment for coverage under the Group Health Plan, the existence of coverage, the benefits structure of the Group Health Plan, claims payment decisions, cost containment program decisions, utilization benefits management, compliance with the requirements of COBRA (Consolidated Omnibus Budget Reconciliation Act of 1985, as amended), compliance with the requirements of ERISA (Employee Retirement Income Security Act of 1974, as amended), compliance with reporting and remitting abandoned property funds, and compliance with any other state and federal law or regulation applicable to the Employer, the Group Health Plan, or the administration of the Group Health Plan.

The Employer agrees to provide BCBSF AND HOI with any information BCBSF AND HOI reasonably requires in order to perform the administrative services set forth herein.

2.2   Eligibility and Enrollment

As of the first day of the term of this Agreement, the Employer will have delivered to BCBSF AND HOI enrollment information regarding eligible and properly enrolled members, as determined by the Employer.  The Employer shall deliver to BCBSF AND HOI all employee and dependent eligibility status changes on a monthly basis, or more frequently as mutually agreed by the parties.

The Employer shall be responsible for providing each covered employee with a copy of the plan document which shall include the Group Health Plan.

2.3  Financial Obligations

A.    Claims Payment

The Employer is financially responsible for the payment of all claims paid under the Group Health Plan. Financial arrangements regarding the payment of such claims are set forth in Exhibit "B".

B.    Administrative Fees

The Employer agrees to promptly pay all administrative fees as set forth in Exhibit "B". Administrative fees are not subject to change during the initial term of this Agreement, except as set forth below. The administrative fees shall be payable to BCBSF AND HOI within 10 days of written notification to the Employer of the amount owed.

C.    Late Charges

In the event the Employer fails to pay any amount owed in full by the due date, the Employer shall pay BCBSF AND HOI, in addition to the amount due, a late charge as set forth in Exhibit "B".

2.4  Use of Names and Logos

The Employer agrees to allow BCBSF AND HOI to use the Employer's name and logo on I.D. cards and other forms necessary to effectuate this Agreement, and to promote the Employer's relationship with BCBSF AND HOI to potential or existing providers. BCBSF AND HOI shall not use the Employer's name or logo for any other purpose without the prior written consent of the Employer.

The Employer agrees that the names, logos, symbols, trademarks, tradenames, and service marks of BCBSF AND HOI, whether presently existing or hereafter established, are the sole property of BCBSF AND HOI and BCBSF AND HOI retains the right to the use and control thereof. The Employer shall not use BCBSF AND HOI's name, logos, symbols, trademarks or service marks in advertising or promotional materials or otherwise without the prior written consent of BCBSF AND HOI and shall cease any such usage immediately upon written notice by BCBSF AND HOI or upon termination of this Agreement, whichever is sooner.

## SECTION III

## DUTIES AND RESPONSIBILITIES OF BCBSF AND HOI

### 3.1  Generally

It is understood and agreed that BCBSF AND HOI is empowered and required to act with respect to the Group Health Plan only as expressly stated herein.

The Employer and BCBSF AND HOI agree that BCBSF AND HOI's role is to provide administrative claims payment services, that BCBSF AND HOI does not assume any financial risk or obligation with respect to claims, that the services rendered by BCBSF AND HOI under this Agreement shall not include the power to exercise control over the Group Health Plan's assets, if any, or discretionary authority over the Health Care Plan's operations, and that BCBSF AND HOI will not for any purpose, under ERISA or otherwise, be deemed to be the "Plan Administrator" of the Group Health Plan or a "fiduciary" with respect to the Group Health Plan.  BCBSF AND HOI's services hereunder are intended to and shall consist only of ministerial functions.  The Group Health Plan's "Administrator" for purposes of ERISA is the Employer.

### 3.2  Enrollment; Forms and I.D. Cards

BCBSF AND HOI shall enroll those individuals who have completed an application and are identified by the Employer as eligible for benefits under the Group Health Plan on the effective date of this Agreement, and subsequently during the continuance of this Agreement.  BCBSF AND HOI shall be entitled to rely on the information furnished to it by the Employer, and the Employer shall hold BCBSF AND HOI harmless for any inaccuracy or failure to provide such information in a timely manner.

BCBSF AND HOI shall furnish to the Employer, for distribution to persons participating in the Group Health Plan, a supply of identification cards, benefit plan descriptions, forms to be used for submission of claims and enrollment, and any other forms necessary for the administration of the Group Health Plan, as determined by BCBSF AND HOI.

### 3.3  Claims Processing

BCBSF AND HOI shall provide claims processing services on behalf of the Employer for all properly submitted claims, in accordance with the benefits and procedures set forth in Exhibit "A", using funds solely supplied by the Employer, as set forth in Exhibit "B".  BCBSF AND HOI shall furnish each claimant with an explanation of each claim that is paid, rejected, suspended or denied.

For purposes of this Agreement, the term "claim(s)" shall be defined as the amount paid or payable by BCBSF AND HOI to providers of services and/or covered group members under this Agreement and the Group Health Plan, and in conformity with any agreements BCBSF AND HOI enters into with such providers of services, and includes capitation, physician incentives, pharmacy, physician, hospital and other fee-for-service claims expenditures.

3.4    Program Administration

BCBSF AND HOI shall administer its established cost containment programs and utilization benefits management programs, as selected by the Employer and described in the Group Health Plan.

BCBSF AND HOI shall make available its Preferred Provider Organization Program(s) to covered group members and their covered dependents, as set forth in the Group Health Plan. Any agreements between providers of services and BCBSF AND HOI are the sole property of BCBSF AND HOI and BCBSF AND HOI retains the right to the use and control thereof.

3.5    Inaccurate Payments

Whenever BCBSF AND HOI becomes aware that the payment of a claim under the Group Health Plan to any person was, or may have been, made which was not in accordance with the terms of the Group Health Plan, whether or not such payment was BCBSF AND HOI's fault, and whether or not such payment was more than or less than was appropriate under the terms of the Group Health Plan, BCBSF AND HOI shall investigate such payment in accordance with its standard commercial insurance business practices and either 1) for a payment of $50.00 or more, make a diligent effort to recover any payment which was more than was appropriate under the Group Health Plan or 2) as the case may be, adjust any claim the payment of which was less than appropriate under the Group Health Plan. The Employer delegates to BCBSF AND HOI the discretion and the authority to determine under what circumstances to compromise a claim or to settle for less than the full amount of the claim. In the event any part of an inaccurate payment is recovered, the Employer will receive a refund from BCBSF AND HOI. Nothing herein shall require BCBSF AND HOI to institute a legal action or suit to recover payments made by BCBSF AND HOI.

Additionally, the Employer delegates to BCBSF AND HOI the discretion and authority to pursue recoveries for claims paid as a result of fraud, abuse or other inappropriate action by a third party, including the right to opt-out or opt-in the Employer from any class action. These claims include, but are not limited to, all legal claims the Employer can assert whether based on common law or statute such as RICO, antitrust, deceptive trade practices, consumer fraud, insurance fraud, unjust enrichment, breach of fiduciary duty, breach of contract, breach of covenant of good faith and fair dealing, torts (including fraud, negligence, and product liability), breach of warranty, medical monitoring, false claims and kickbacks. If BCBSF AND HOI obtains

5

a recovery from any of these efforts, BCBSF AND HOI will reimburse the Employer's pro rata share of the recovery. This share is calculated from the Employer's claims history or covered members at the time of such recovery, less the Employer's pro rata share of costs, if any, fees paid to outside counsel and any other costs incurred in obtaining that recovery. BCBSF AND HOI will not charge the Employer for any costs if BCBSF AND HOI does not obtain a recovery that exceeds those costs.

### 3.6   Records and Reports

BCBSF AND HOI agrees to establish, maintain and provide to the Employer, records and reports generated for the purposes of reporting claims experience and conducting audits of operations. BCBSF AND HOI will provide claims information only accordance with Exhibit C (and Exhibit D, if applicable) to this Agreement. BCBSF AND HOI will not provide any information with regard to provider pricing agreements or any other information which is of a confidential or proprietary nature, as determined by BCBSF AND HOI.

### 3.7   Claims Payments

The source or sources of payment under the Group Health Plan are to be only the assets of the Employer, and BCBSF AND HOI will have no liability whatsoever for providing a source from which payments will be made under the Health Care Plan.

### 3.8   Providers Outside the State of Florida

#### A.   BlueCard

Administrator participates in a program called "BlueCard." Whenever member's access health care services outside the geographic area BCBSF AND HOI serves, the claim for those services may be processed through BlueCard and presented to BCBSF AND HOI for payment in conformity with network access rules of the BlueCard Policies then in effect ("Policies"). Under BlueCard, when members receive covered health care services within the geographic area served by an on-site Blue Cross and/or Blue Shield Licensee ("Host Blue"), BCBSF AND HOI will remain responsible to Employer for fulfilling BCBSF AND HOI contract obligations. However, the Host Blue will only be responsible, in accordance with applicable BlueCard Policies, if any, for providing such services as contracting with its participating providers and handling all interaction with its participating providers. The financial terms of BlueCard are described generally below.

#### B.   Liability Calculation Method Per Claim

6

The calculation of member liability on claims for covered health care services incurred outside the geographic area BCBSF AND HOI serves and processed through BlueCard will be based on the lower of the provider's billed charges or the negotiated price BCBSF AND HOI pays the Host Blue.

The calculation of Employer's liability on claims for covered health care services incurred outside the geographic area BCBSF AND HOI serves and processed through BlueCard will be based on the negotiated price BCBSF AND HOI pays the Host Blue.

The methods employed by a Host Blue to determine a negotiated price will vary among Host Blues based on the terms of each Host Blue's provider contracts. The negotiated price paid to a Host Blue by Administrator on a claim for health care services processed through BlueCard may represent:

(i) the actual price paid on the claim by the Host Blue to the health care provider ("Actual Price"), or

(ii) an estimated price, determined by the Host Blue in accordance with BlueCard Policies, based on the Actual Price increased or reduced to reflect aggregate payments expected to result from settlements, withholds, any other contingent payment arrangements and non-claims transactions with all of the Host Blue's health care providers or one or more particular providers ("Estimated Price"), or

(iii) an average price, determined by the Host Blue in accordance with BlueCard Policies, based on a billed charges discount representing the Host Blue's average savings expected after settlements, withholds, any other contingent payment arrangements and non-claims transactions for all of its providers or for a specified group of providers ("Average Price"). An Average Price may result in greater variation to the member and the Employee from the Actual Price than would an Estimated Price.

Host Blues using either the Estimated Price or Average Price will, in accordance with BlueCard Policies, prospectively increase or reduce the Estimated Price or Average Price to correct for over - or underestimation of past prices. However, the amount paid by the member and the Employer is a final price and will not be affected by such prospective adjustment. In addition, the use of a liability calculation method of Estimated Price or Average Price may result in some portion of the amount paid by the Employer being held in a variance account by the Host Blue, pending settlement with its participating providers. Because all amounts paid are final, the fund held in a variance account, if any, do not belong to the Employer and are eventually exhausted by provider settlements and through prospective adjustment to the negotiated prices.

Statutes in a small number of states may require a Host Blue either (1) to use a basis for calculating the member's liability for covered health care services

7

that does not reflect the entire savings realized, or expected to be realized, on a particular claim or (2) to add a surcharge. Should any state statutes mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, the Host Blue would then calculate member's liability and the Employer liability for any covered health care services consistent with the applicable state statute in effect at the time the member received those services.

C.    Return of Recoveries

Under BlueCard, recoveries from a Host Blue or from participating providers of a Host Blue can arise in several ways, including but not limited to anti-fraud and abuse audits, provider/hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some cases, the Host Blue will engage third parties to assist in discovery or collection of recovery amounts. The fees of such a third party are netted against the recovery. Recovery amounts, net of fees, if any, will be applied in accordance with applicable BlueCard Policies, which generally require correction on a claim-by-claim or prospective basis.

Unless otherwise agreed to by the Host Blue, Home Licensees may request adjustments from the Host Blue for full provider refunds due to the retroactive cancellation of membership only for one year after the Inter-Licensee financial settlement process date of the original claim. However, recovery of claim payments associated with a retroactive cancellation may not be possible if the recovery conflicts with the Host Blue's state law, provider contracts or jeopardizes its relationship with its providers.

D.    BlueCard Fees and Compensation

Employer understands and agrees (1) to pay certain fees and compensation to BCBSF AND HOI which BCBSF AND HOI is obligated under BlueCard to pay to the Host Blue, to the Blue Cross Blue Shield Association, or to the BlueCard vendors, unless BCBSF AND HOI's contract obligations to the Employer require those fees and compensation to be paid only by Administrator and (2) that fees and compensation under BlueCard may be revised from time to time without Employer's prior approval in accordance with the standard procedures for revising fees and compensation under BlueCard. Some of these fees and compensation are charged each time a claim is processed through BlueCard and include, but are not limited to, access fees, administrative expense allowance fees, Central Financial Agency Fees, and ITS Transaction Fees. Also, some of these claim-based fees, such as the access fee and the administrative expense allowance fee may be passed on to the Employer as an additional claim liability. Other fees include, but are not limited to, an 800 number fee and a fee for providing provider directories.

E.    Inconsistencies

To the extent of any inconsistency between the above provision titled "Providers Outside the State of Florida" and other terms or conditions of the Agreement, the above provision controls.

## SECTION IV

## TERMINATION

4.1    Administration After Termination

The Employer is solely liable and responsible for all claims incurred under the Group Health Plan by its covered group members and their dependents during the term of this Agreement, including those incurred claims which are not presented to the Employer or BCBSF AND HOI during the term of this Agreement. BCBSF AND HOI will adjudicate all claims incurred during the term of this Agreement. For purposes of this Agreement, the date of an incurred claim is the date the particular service was rendered or the supply was furnished. After the effective date of termination of this Agreement, the Employer will continue to provide BCBSF AND HOI with funds to pay claims incurred prior to the termination date and will continue to pay the applicable administrative fees as set forth in Exhibit "B".

4.2    Unilateral Termination

The Employer or BCBSF AND HOI may unilaterally terminate this Agreement upon 90 days prior written notice to the other after the initial term of this Agreement.

4.3    Termination On Anniversary Date

This Agreement shall automatically terminate as of the date of any anniversary of the effective date of this Agreement, if either the Employer or BCBSF AND HOI has given at least 30 days prior written notice to the other of its intention not to renew this Agreement as of that anniversary date.

4.4    Termination Upon Default

Upon the occurrence of any of the following events, as determined by BCBSF AND HOI, this Agreement will automatically terminate at the end of the 8th business day following the day upon which the Employer is notified of any of the events of default set forth hereunder, and then only in the event that the Employer has not cured the incident of default:

1.    The Employer's failure to provide adequate funds, as set in Exhibit "B", as necessary for the payment of claims pursuant to the Group Health Plan;

9

2.   The Employer's failure to pay any administrative fees or late penalty as set forth in Exhibit "B" of this Agreement;

3.   The Employer ceases to maintain a Group Health Plan;

4.   The Employer modifies the Group Health Plan without the prior written consent of BCBSF AND HOI;

5.   At any time BCBSF AND HOI has reasonable grounds for insecurity with respect to the Employer's financial ability to adequately fund the Group Health Plan, and the Employer has failed to immediately provide adequate assurances of financial soundness to BCBSF AND HOI;

6.   At any time any judicial or regulatory body determines that this Agreement, or any provision of this Agreement, is invalid or illegal, or that this arrangement constitutes an insurance policy or program which is subject to state and/or federal insurance regulations and/or taxation;

7.   At any time the Employer otherwise materially breaches this Agreement.

4.5   Rights and Responsibilities Upon Termination

In the event of termination of this Agreement, the Employer will immediately notify each covered group member of the termination date.

Termination of this Agreement for any reason shall not affect the rights or obligations of either party which arise prior to the date of termination.

SECTION V

LEGAL ACTION; INDEMNIFICATION

5.1   Standard of Care

BCBSF AND HOI and the Employer shall each use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims in the performance of its duties hereunder.

10

5.2 Legal Actions

In the event any party is served with process in any lawsuit or is made a party to any arbitration proceeding, the other parties will fully-cooperate and provide available data and materials that are reasonably necessary for the preparation of the defense of such lawsuit, proceeding or other action.

## SECTION VI

## MISCELLANEOUS PROVISIONS

6.1 Amendment

Except as otherwise provided for herein, this Agreement may be modified, amended, renewed, or extended only upon mutual agreement, in writing, signed by the duly authorized representatives of the Employer and BCBSF AND HOI.

6.2 Subsidiaries and Affiliates

Any of the functions to be performed by BCBSF AND HOI under this Agreement may be performed by BCBSF AND HOI or any of its subsidiaries, affiliates, or designees.

6.3 Governing Law

This Agreement is subject to and shall be governed by the laws of the State of Florida, except where those laws are preempted by the laws of the United States.

6.4 Venue

All actions or proceedings instituted by the Employer or BCBSF AND HOI hereunder shall be brought in a court of competent jurisdiction in Brevard County, Florida.

6.5 Waiver of Breach

Waiver of a breach of any provision of this Agreement shall not be deemed a waiver of any other breach of the same or a different provision.

6.6 Inconsistencies

If the provisions of this Agreement are in any way inconsistent with the provisions of the Group Health Plan, then the provisions of this Agreement shall prevail and the other provisions shall be deemed modified, but only to the extent necessary to implement the intent of the parties expressed herein.

6.7  Notices

Any notice required to be given pursuant to this Agreement shall be in writing, postage pre-paid, and shall be sent by certified or registered mail, return receipt requested, or by Federal Express or other overnight mail delivery for which evidence of delivery is obtained by the sender, to BCBSF AND HOI or the Employer at the addresses indicated on the first page of this Agreement, or such other addresses that the parties may hereafter designate.  The notice shall be effective on the date the notice was posted.

6.8  Entire Agreement

This Agreement, including the attachments hereto, contains the entire agreement between BCBSF AND HOI and the Employer with respect to the specific subject matter hereof.  Any prior agreements, promises, negotiations or representations, either verbal or written, relating to the subject matter of this Agreement and not expressly set forth in this Agreement are of no force and effect.

6.9  Severability

In the event any provision of this Agreement is deemed to be invalid or unenforceable, all other provisions shall remain in full force and effect.

6.10  Binding Effect of Agreement

The Agreement shall be binding upon and inure to the benefit of the parties, their agents, servants, employees, successors, and assigns unless otherwise set forth herein or agreed to by the parties.

6.11  Survival

The rights and obligations of the parties as set forth herein shall survive the termination of this Agreement to the extent necessary to effectuate the intent of the parties as expressed herein.

6.12  Independent Relationship

Notwithstanding any other provision of this Agreement, in the performance of the obligations of this Agreement, each party is at all times acting and performing as an independent contractor with respect to the other party.  It is further expressly agreed that no work, act, commission or omission of either party (or any of its agents or employees) pursuant to the terms and conditions of this Agreement, shall be construed to make or render such party (or any of its agents or employees) an agent, servant, representative, or employee of, or joint venture with, such other party.

6.13 <u>Execution of Agreement</u>

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and such counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, on the date first written above, the parties have caused this Agreement to be executed by their duly authorized representatives.

BLUE CROSS AND BLUE SHIELD
FLORIDA, INC.

_____
Signature

William Coats
Name (Printed)

V P - Underwriting
Title

2/23/07
Date


BREVARD PUBLIC SCHOOLS

_____
Signature

Susan G. Standley
Name (Printed)

Director, Comp. & Benefits
Title

2/20/07
Date


HEALTH OPTIONS, INC.

_____
Signature

William Coats
Name (Printed)

V P - Underwriting
Title

2/23/07
Date

13

## EXHIBIT "A"

### to the
### ADMINISTRATIVE SERVICES AGREEMENT
### between

## BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.

and

## HEALTH OPTIONS, INC.

and

## BREVARD PUBLIC SCHOOLS

### GROUP HEALTH PLAN

The entire Group Health Plan is attached hereto and made a part of this Agreement.

**EXHIBIT "B"**

**to the**
**ADMINISTRATIVE SERVICES AGREEMENT**
**between**

**BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.**

**and**

**HEALTH OPTIONS, INC.**

**BREVARD PUBLIC SCHOOLS**

FINANCIAL ARRANGEMENTS

I.    Effective Date

The effective date of this Exhibit is January 1, 2007.

II.   Monthly Payments.

A.    Each month, BCBSF AND HOI will notify the Employer of the amount due to satisfy the previous month's paid claims liability. BCBSF AND HOI also will provide the Employer with a detailed printout of the previous month's claims payments. The Employer agrees to pay the full amount of the bill within ten (10) days of the written notification. If the payment is not received by BCBSF AND HOI by the payment due date, the payment will be considered past due and subject to a late payment charge, as set forth below. Additionally, BCBSF AND HOI will immediately suspend claims until payment is received by BCBSF AND HOI.

B.    The Employer agrees to pay to BCBSF AND HOI, each month during and after the term of this Agreement, an administrative fee, as set forth below. The Employer agrees to pay to BCBSF AND HOI, each month, the administrative fee within ten (10) days of the written notification of the amount due. If payment is not received by BCBSF AND HOI by the due date, the payment will be considered past due and subject to a late payment charge, as set forth below. Additionally, BCBSF AND HOI will immediately suspend claims until payment is received by BCBSF AND HOI.

III.    Funding Information

    A.    Method of Funding Transfer:  ACH

IV.    Administrative Fees:

    A.    Administrative fees during the term of the Agreement:

        01/01/2007 - $33.50 per enrolled employee per month
        01/01/2008 - $35.17 per enrolled employee per month
        01/01/2009 - $36.93 per enrolled employee per month
        01/01/2010 - $38.78 per enrolled employee per month
        01/01/2011 - $40.72 per enrolled employee per month

    B.    Administrative fees after the termination of the Agreement:  0% of claims
        paid. Administrative fees include all run-out claims processing.

V.    Late Payment Penalty

    A.    A daily charge of .00038 times the amount of overdue payment.

VI.    Expected Enrollment

    A.    The administrative fees referenced above are based on BCBSF AND HOI
        being one of two carriers offered.

VII.    Performance Guarantees

    A.    The following Discount Guarantee and Risk Arrangement is based on
        BCBSF AND HOI being one of two carriers:

| BlueCare Open Access HMO | | BlueOptions Open Access POS | | BlueChoice PPO | | Traditional | |
|---|---|---|---|---|---|---|---|
| 60% | | 58% | | 56% | | 55% | |
| Discount | Penalty | Discount | Penalty | Discount | Penalty | Discount | Penalty |
| <58% | $25,000 | <56% | $25,000 | <54% | $25,000 | <53% | $25,000 |
| <56% | $100,000 | <54% | $100,000 | <52% | $100,000 | <51% | $100,000 |
| <54% | $200,000 | <52% | $200,000 | <50% | $200,000 | <49% | $200,000 |
| <52% | $350,000 | <50% | $350,000 | <48% | $350,000 | <47% | $350,000 |

    B.    In the following chart, BCBSF AND HOI offers specific operational
        performance guarantees to be tracked monthly and rolled up as a yearly

goal. The penalty outlined below for BCBSF AND HOI not meeting Operational Performance Guarantees will be paid at plan year end.

| Service Indicator | BCBSF AND HOI Performance Standard | Financial Penalty |
|---|---|---|
| Financial Accuracy | 98%+ | 12.5% of total penalty |
| Processing Accuracy (Frequency) | 95%+ | 12.5% of total penalty |
| Claims Payment Accuracy | 95% | 12.5% of total penalty |
| Claims Cycle Time <30 days | 90% process in 14 business days or less 97% process in 30 business days or less | 12.5% of total penalty |
| Average Speed of Answer | 80% in 30 seconds | 12.5% of total penalty |
| Abandonment Rate | 5% | 12.5% of total penalty |
| Inquiry Cycle Time <30 days | 97% | 12.5% of total penalty |
| Membership and Billing – ID cards in 10 days or less (at initial enrollment or annual open enrollment only) | 99% | 12.5% of total penalty |
| Total | | $50,000 |

**EXHIBIT "C"**

to the

**ADMINISTRATIVE SERVICES AGREEMENT**

between

**BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.**

and

**HEALTH OPTIONS, INC.**

and

**BREVARD PUBLIC SCHOOLS**

### HIPAA-AS ADDENDUM TO ADMINISTRATIVE SERVICES AGREEMENT

This addendum ("Addendum") is effective upon execution and amends that Administrative Services Agreement ("Agreement") made as of January 1, 2007 by and among Blue Cross and Blue Shield of Florida, Inc. ("Administrator"); Health Options, Inc. ("Administrator"); Brevard Public Schools ("Employer") and Brevard Public Schools Health Plan ("GHP").

WHEREAS, Employer has established and maintains GHP as a self-insured employee welfare benefit plan, as described in GHP's Plan Document (referred to in the Agreement as the Group Health Plan); and

WHEREAS, Employer and GHP desire to retain Administrators to provide certain claim processing and administrative services with respect to GHP; and

WHEREAS, Employer, GHP, and Administrators agree to modify the Agreement to incorporate the provisions of this Addendum to address applicable requirements of the implementing regulations, codified at 45 Code of Federal Regulations ("C.F.R.") Parts 160-64, for the Administrative Simplification provisions of Title II, Subtitle F of the Health Insurance Portability and Accountability Act of 1996 (collectively, "HIPAA-AS"), so that GHP may meet its compliance obligations under HIPAA-AS, and to include additional provisions that Employer, GHP, and Administrators desire to have as part of the Agreement;

NOW, THEREFORE, in consideration of the mutual promises contained herein, Employer, GHP, and Administrators hereby agree as follows:

### PART 1—DEFINITIONS

**I. DEFINITIONS**

All capitalized terms in this Addendum that are not defined by this Addendum will have the meaning ascribed to them by 45 C.F.R. Parts 160-64. The following terms have the following meanings when used in this Addendum:

    A.    "Covered Employee" means the person to whom coverage under GHP has been extended by Employer.

    B.    "Covered Person" means the Covered Employee and any other persons to whom coverage has been extended under GHP as specified by GHP's Plan Document.

    C.    "Creditable Coverage Certificate" means a certificate disclosing information relating to an individual's creditable coverage under a health care benefit program for purposes of

-C1-

reducing any preexisting condition limitation or exclusion imposed by any group health plan coverage.

D.    "Disclose" and "disclosure" mean, with respect to Protected Health Information, release, transfer, providing access to or divulging to a person or entity not within Administrators.

E.    "Electronic Protected Health Information" means Protected Health Information that is (1) transmitted by electronic media or (2) maintained in electronic media.

F.    "Protected Health Information" means the Protected Health Information, as that term is defined in 45 C.F.R. § 160.103, that Administrators creates or receives for, on behalf of, or from GHP (or from a GHP Business Associate) in the performance of Administrators's duties under the Agreement and this Addendum.    For purposes of this Addendum, Protected Health Information encompasses Electronic Protected Health Information.

G.    "Plan Document" means GHP's written documentation that informs Covered Persons of the benefits to which they are entitled from GHP and describes the procedures for (1) establishing and carrying out funding of the benefits to which Covered Persons are entitled under GHP, (2) allocating and delegating responsibility for GHP's operation and administration, and (3) amending the Plan Document. Employer and GHP represent and warrant that GHP's Plan Document provides for the allocation and delegation of the responsibilities assigned to Administrators under the Agreement.

I.    "Use" means, with respect to Protected Health Information, utilization, employment, examination, analysis or application within Administrators.

## PART 2--ADMINISTRATORS'S RESPONSIBILITIES

## II.    SERVICES PROVIDED BY ADMINISTRATORS

During the continuance of the Agreement, Administrators will perform the services set forth in the Agreement with respect to the benefits offered to Covered Persons by GHP.

## III.    PRIVACY AND SECURITY OF PROTECTED HEALTH INFORMATION

### A.    Preservation of Privacy

Administrators will keep confidential all Protected Health Information that Administrators creates or receives on GHP's behalf or receives from GHP (or another Business Associate of GHP) in the performance of its duties under the Agreement and this Addendum.

### B.    Prohibition on Non-Permitted Use or Disclosure

Administrators will neither use nor disclose Protected Health Information (including any Protected Health Information that Administrators may receive from a GHP Business Associate) except (1) as permitted or required by this Addendum, (2) as permitted or required in writing by GHP, or (3) as Required by Law.

### C.    Permitted Uses and Disclosures

Administrators will be permitted to use or disclose Protected Health Information only as follows:

1.    **Functions and Activities on GHP's Behalf**

Administrators will be permitted to use and disclose Protected Health Information for the performance of services set forth in the Agreement, which the parties agree are intended to include, but are not limited to, Payment activities and Health Care Operations, and which shall hereby also include Data Aggregation.

2.    **Payment Activities and Health Care Operations**

Administrators will be permitted to disclose Protected Health Information in accordance with 45 C.F.R. § 164.506(c) for the Payment activities of another Covered Entity or Health Care Provider and for the qualifying Health Care Operations of another Covered Entity.

3.    **Covered Person Permission**

Administrators will be permitted to use or disclose Protected Health Information in accordance with an authorization or other permission granted by an Individual (or the Individual's Personal Representative) in accordance with 45 C.F.R. § 164.508 or 45 C.F.R. § 164.510, as applicable.

4.    **Administrators's Own Management and Administration**

    a.    **Protected Health Information Use**

    Administrators will be permitted to use Protected Health Information as necessary for Administrators's proper management and administration or to carry out Administrators's legal responsibilities.

    b.    **Protected Health Information Disclosure**

    Administrators will be permitted to disclose Protected Health Information as necessary for Administrators's proper management and administration or to carry out Administrators's legal responsibilities only (i) if the disclosure is Required by Law, or (ii) if before the disclosure, Administrators obtains from the entity to which the disclosure is to be made reasonable assurance, evidenced by written contract, that the entity will (1) hold Protected Health Information in confidence, (2) use or further disclose Protected Health Information only for the purposes for which Administrators disclosed it to the entity or as Required by Law; and (3) notify Administrators of any instance of which the entity becomes aware in which the confidentiality of any Protected Health Information was breached.

5.    **De-Identified Health Information**

Administrators may use Protected Health Information to create De-Identified Health Information in conformance with 45 C.F.R. § 164.514(b). Administrators may use and disclose De-Identified Health Information for any purpose, including after any termination of the Agreement and this Addendum.

6.    **Limited Data Set**

    a.    **Creation of Limited Data Set.**  Administrators may use Protected Health Information to create a Limited Data Set:

      i.  that contains the minimum amount of Protected Health Information reasonably necessary to accomplish the purposes set out in Paragraph b of this Section III.C.6, below; and

      ii.  from which have been removed all of the direct identifiers, as specified in 45 C.F.R. § 164.514(e)(2), of the Individuals whose Protected Health Information is included in the Limited Data Set and of the relatives, household members and employers of those Individuals.

**b.** **Administrators's Permitted Uses and Disclosures.** Administrators may use and disclose the Limited Data Set for only Health Care Operations permitted by this Addendum.

**c.** **Prohibition on Unauthorized Use or Disclosure.**

      i.  Administrators will neither use nor disclose the Limited Data Set for any purpose other than as permitted by Paragraph b of this Section III.C.6, as otherwise permitted in writing by GHP, or as Required by Law.

      ii.  Administrators is not authorized to use or disclose the Limited Data Set in a manner that would violate the Privacy Rule, 45 C.F.R. Part 164, Subpart E, if done by GHP.

      iii.  Administrators will not attempt to identify the information contained in the Limited Data Set or contact any Individual who may be the subject of information contained in the Limited Data Set.

**d.** **Information Safeguards.** Administrators will adopt and use appropriate administrative, physical, and technical safeguards to preserve the integrity and confidentiality of the Limited Data Set and to prevent its use or disclosure other than as permitted by this Section III.C.6.

**e.** **Permitted Subcontractors, and Agents.** Administrators will require any agent or subcontractor to which it discloses the Limited Data Set, to agree to comply with the same restrictions and conditions that apply to Administrators's use and disclosure of the Limited Data Set pursuant to this Section III.C.6.

**f.** **Breach of Privacy Obligations.** Administrators will report to GHP any use or disclosure of the Limited Data Set that is not permitted by this Section III.C.6 of which Administrators becomes aware.

**D.** **Minimum Necessary**

Administrators will, in the performance of its functions and activities on GHP's behalf under the Agreement and this Addendum, make reasonable efforts to use, to disclose, or to request of a Covered Entity only the minimum necessary amount of Protected Health Information to accomplish the intended purpose of the use, the disclosure, or the request, except that Administrators will not be obligated to comply with this minimum necessary limitation with respect to:

    1.    Disclosures to GHP, as distinguished from disclosures to Employer;

2.   Disclosure to or request by a health care provider for Treatment;

3.   Use with or disclosure to a Covered Person who is the subject of Protected Health Information, or that Covered Person's Personal Representative;

4.   Use or disclosure made pursuant to an authorization compliant with 45 C.F.R. § 164.508 that is signed by an Individual who is the subject of Protected Health Information to be used or disclosed, or by that Individual's Personal Representative, as defined in 45 C.F.R. § 164.502(g);

5.   Disclosure to the United States Department of Health and Human Services ("DHHS") in accordance with Section VIII below;

6.   Use or disclosure that is Required by Law; or

7.   Any other use or disclosure that is excepted from the minimum necessary limitation as specified in 45 C.F.R. § 164.502(b)(2).

**E.   Disclosure to GHP and GHP's Business Associates**

Other than disclosures permitted by Section III.C. above, Administrators will not disclose Protected Health Information to GHP, a GHP Business Associate, or a GHP Vendor, except as directed by GHP in writing.

**F.   Disclosure to Administrators's Subcontractors and Agents**

Administrators may disclose Protected Health Information to a subcontractor or agent. Administrators will require each subcontractor and agent to which Administrators may disclose Protected Health Information to provide reasonable assurance, evidenced by written contract, that such subcontractor or agent will comply with the same privacy and security obligations with respect to Protected Health Information as this Addendum applies to Administrators.

**G.   Disclosure to Employer**

Administrators will not disclose any Protected Health Information to Employer, except as permitted by and in accordance with PART 3 below.

**H.   Reporting Non-Permitted Use or Disclosure and Security Incidents**

**1.   Privacy Breach**

Administrators will report to GHP any use or disclosure of Protected Health Information not permitted by this Addendum or in writing by GHP of which Administrators becomes aware.

**2.   Security Incidents**

Administrators will report to GHP any incident of which Administrators becomes aware that is (a) a successful unauthorized access, use or disclosure of Electronic Protected Health Information; or (b) a successful major (i) modification or destruction of Electronic Protected Health Information or (ii) interference with system operations in an Information System containing Electronic Protected Health Information.   Upon GHP's request, Administrators will report any incident of which Administrators becomes aware that is a

successful minor (a) modification or destruction of Electronic Protected Health Information or (b) interference with system operations in an Information System containing Electronic Protected Health Information.

**I.    Duty to Mitigate**

Administrators will mitigate to the extent practicable any harmful effect of which Administrators is aware that is caused by any use or disclosure of Protected Health Information in violation of this Addendum.

**J.    Termination of Addendum**

GHP will have the right to terminate the Agreement and this Addendum if Administrators has engaged in a pattern of activity or practice that constitutes a material breach or violation of Administrators's obligations regarding Protected Health Information under this Addendum and, on notice of such material breach or violation from GHP, fails to take reasonable steps to cure the breach or end the violation. If Administrators fails to cure the material breach or end the violation within 90 days after receipt of GHP's notice, GHP may terminate the Agreement and this Addendum by providing Administrators written notice of termination, stating the uncured material breach or violation that provides the basis for the termination and specifying the effective date of the termination.

**K.    Disposition of Protected Health Information**

  **1.    Return or Destruction Feasible**

  Upon termination of the Addendum, Administrators will, if feasible, return to GHP or destroy, all Protected Health Information in Administrators's custody or control (or in the custody or control of any subcontractor or agent to which Administrators disclosed Protected Health Information). Administrators will complete such return or destruction as promptly as practical after termination of the Addendum.

  **2.    Return or Destruction Not Feasible**

  Administrators will identify for GHP any Protected Health Information that Administrators (or any subcontractor or agent to which Administrators disclosed Protected Health Information) cannot feasibly return to GHP or destroy upon termination of the Addendum and will describe the purposes that make the return to GHP or destruction infeasible. Administrators will limit its (and, by its written contract pursuant to Section III.F. above, any subcontractor's or agent's) further use or disclosure of Protected Health Information after termination of the Addendum to the purposes that make return to GHP or destruction infeasible and to those uses or disclosures Required by Law.

  **3.    Ongoing Privacy and Security Obligations**

  Administrators's obligations to preserve the privacy and safeguard the security of Protected Health Information as specified in this Addendum will survive termination or other conclusion of the Agreement and this Addendum.

## IV.    ACCESS, AMENDMENT, AND DISCLOSURE ACCOUNTING FOR PROTECTED HEALTH INFORMATION

### A.    Access

Administrators will, consistent with 45 C.F.R. § 164.524(b)(2), make available to the Covered Person (or the Covered Person's Personal Representative) for inspection and copying any of the Protected Health Information about the Covered Person that qualifies as part of a Designated Record Set that Administrators has in its custody or control, and that is not exempted from access by 45 C.F.R. § 164.524(a), so that GHP can meet its access obligations under 45 C.F.R. § 164.524.

### B.    Amendment

Administrators will, consistent with 45 C.F.R. § 164.526(b)(2), amend, pursuant to a Covered Person's written request to amend (or a written request to amend by the Covered Person's Personal Representative), any portion of Protected Health Information about the Covered Person that qualifies as part of a Designated Record Set that Administrators has in its custody or control, so that GHP can meet its amendment obligations under 45 C.F.R. § 164.526.

### C.    Disclosure Accounting

So that GHP may meet its disclosure accounting obligations under 45 C.F.R. § 164.528, Administrators will do the following:

#### 1.    Disclosure Tracking

Starting April 14, 2003, Administrators will, consistent with 45 C.F.R. § 164.528(b), record each disclosure of Protected Health Information that is not excepted from disclosure accounting under 45 C.F.R. § 164.528(a) that Administrators makes to GHP or to a third party ("Accountable Disclosures").

#### 2.    Disclosure Tracking Time Periods

Administrators will have available for Covered Person the disclosure information for each Accountable Disclosure for at least six (6) years immediately following the date of the Accountable Disclosure (except Administrators will not be required to have disclosure information for disclosures occurring before April 14, 2003).

#### 3.    Provision of Disclosure Information

Administrators will, consistent with 45 C.F.R. § 164.528(c)(1), make available to the Covered Person (or the Covered Person's Personal Representative) the disclosure information regarding the Covered Person, so that GHP can meet its disclosure accounting obligations under 45 C.F.R. § 164.528.

### D.    Restriction Requests

GHP will direct a Covered Person to promptly notify Administrators in the manner designated by Administrators of any request for restriction on the use or disclosure of Protected Health Information about a Covered Person that may affect Administrators. Consistent with 45 C.F.R. § 164.522(a), and on behalf of GHP, Administrators will agree to or deny any such restriction request. Administrators will not be in breach of the Agreement or this Addendum for failure to comply with a restriction request on the use or disclosure of Protected Health Information about a

Covered Person unless GHP or the Covered Person (or the Covered Person's Personal Representative) notifies Administrators in the manner designated by Administrators of the terms of the restriction and Administrators agrees to the restriction request in writing.

**E.    Confidential Communications**

Administrators will provide a process for a Covered Person to request that Administrators communicate with the Covered Person about Protected Health Information about the Covered Person by confidential alternative location, and Covered Person to provide Administrators with the information that Administrators needs to be able to evaluate that request.  Consistent with 45 C.F.R. § 164.522(b) and on behalf of GHP, Administrators will agree to or deny any confidential communication request.   Furthermore, Administrators will develop policies and procedures consistent with 45 C.F.R. § 164.522(b) to fulfill its obligations under this paragraph.

Administrators will provide a process for termination of any requirement to communicate with the Covered Person about Protected Health Information about the Covered Person by confidential alternative location.

**F.    Complaint Process**

Administrators will, consistent with 45 C.F.R. § 164.530(d) and on behalf of GHP, provide a process for Covered Persons (or Covered Person's Personal Representative) to make complaints concerning Administrators's policies and procedures, which policies and procedures GHP hereby adopts as its own so that GHP can meet its compliance obligations under 45 C.F.R. Part 164.

**V.    GHP'S PRIVACY PRACTICES NOTICE**

**A.    Preparation of GHP's Privacy Practices Notices**

Administrators will prepare Privacy Practices Notices appropriate for the benefit plans that Administrators administers for GHP under the Agreement and reflective of the requirements of 45 C.F.R. Part 164 pertaining to use and disclosure of Protected Health Information and Covered Person's rights with respect to Protected Health Information.  The Privacy Practices Notices will address whether GHP discloses or authorizes Administrators to disclose to Employer enrollment data, Summary Health Information that may include Covered Persons' Individually Identifiable Health Information, or Protected Health Information for plan administration functions.  Unless otherwise agreed upon by the Parties, GHP hereby adopts Administrators's Privacy Practices Notice attached as **EXHIBIT 1**, and any future revisions thereof, as its own.

**B.    Distribution of GHP's Privacy Practices Notice**

Administrators will distribute GHP's then effective and appropriate Privacy Practices Notice to each new Covered Employee upon the Covered Employee's enrollment in GHP and to any Covered Employee upon request.  Administrators will distribute any GHP revised Privacy Practices Notice to each Covered Employee then enrolled in GHP, and may distribute any GHP revised Privacy Practices Notice to any other Covered Person over the age of 18 then enrolled in GHP, within sixty (60) days after any material change in GHP's Privacy Practices Notice.

Administrators will distribute GHP's Privacy Practices Notice to any Covered Person requesting it. Additionally, every three (3) years after April 14, 2003, Administrators will notify each Covered Employee then enrolled in GHP, and may notify any other Covered Person over the age of 18 then enrolled in GHP, of the availability of GHP's Privacy Practices Notice upon request.

### C.    Administrators to Comply with Notices

Administrators will neither use nor disclose Protected Health Information in any manner inconsistent with the content of GHP's then current Privacy Practices Notice applicable to the benefit plans that Administrators administers for GHP under the Agreement.

## VI.    ISSUANCE OF CERTIFICATE OF CREDITABLE COVERAGE

At the written or electronic direction of Employer or GHP, Administrators may use and disclose Protected Health Information to issue to each Covered Person, whose coverage under a benefits plan administered pursuant to the Agreement terminates during the term of the Agreement, a Certificate of Creditable Coverage. The Certificate of Creditable Coverage will be based upon the coverage that the Covered Person had under the benefits plan administered pursuant to the Agreement and the information that Employer or GHP provides to Administrators regarding the Covered Person's coverage eligibility and coverage termination under that benefits plan.

## VII.    SAFEGUARDING PROTECTED HEALTH INFORMATION

### A.    Privacy of Protected Health Information

Administrators will maintain reasonable and appropriate administrative, physical, and technical safeguards, consistent with 45 C.F.R. § 164.530(c) and any other implementing regulations issued by DHHS that are applicable to Administrators as GHP's Business Associate, to protect against reasonably anticipated threats or hazards to and to ensure the security and integrity of Protected Health Information, to protect against reasonably anticipated unauthorized use or disclosure of Protected Health Information, and to reasonably safeguard Protected Health Information from any intentional or unintentional use or disclosure in violation of this Addendum.

### B.    Security of Electronic Protected Health Information

Administrators will develop, implement, maintain, and use administrative, technical, and physical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of Electronic Protected Health Information that Administrators creates, receives, maintains, or transmits on behalf of GHP consistent with the Security Rule, 45 C.F.R. Part 164, Subpart C.

## VIII.    INSPECTION OF INTERNAL PRACTICES, BOOKS, AND RECORDS

Administrators will make its internal practices, books, and records relating to its use and disclosure of Protected Health Information available to GHP and to DHHS to determine GHP's compliance with 45 C.F.R. Part 164, Subpart E "Privacy of Individually Identifiable Health Information."

### PART 3—EMPLOYER'S RESPONSIBILITIES

## IX.    DATA EXCHANGE BETWEEN EMPLOYER AND ADMINISTRATORS

### A.    Enrollment Data

Administrators may disclose to Employer the minimum necessary information regarding whether an individual is a Covered Person participating in GHP or enrolled or disenrolled from coverage under the GHP.

Employer may electronically exchange data with Administrators regarding the enrollment and disenrollment of Covered Persons as participants in GHP using the Enrollment and Disenrollment

in Health Plan Standard Transaction (ASC X12N 834-Benefit Enrollment and Maintenance) as specified in 45 C.F.R. Part 162, Subpart O.

**B.     Other Data Exchanges and Notifications**

Employer will exchange with Administrators all data not otherwise addressed in this Section IX and any notification by using such forms, tape formats, or electronic formats as Administrators may approve. Employer will furnish all information reasonably required by Administrators to effect such data exchanges or notifications.

## X.     SUMMARY HEALTH INFORMATION

Upon Employer's written request for the purpose either (A) to obtain premium bids for providing health insurance coverage under GHP, or (B) to modify, amend, or terminate GHP, Administrators will provide Summary Health Information regarding the Covered Persons participating in GHP to Employer.

## XI.     EMPLOYER'S CERTIFICATION

Employer hereby makes the certification specified in **EXHIBIT 2** so that Employer may request and receive the minimum necessary Protected Health Information from Administrators for those plan administration functions that Employer will perform for GHP. GHP therefore authorizes Administrators to disclose the minimum necessary Protected Health Information to those authorized representatives of Employer as specified in **EXHIBIT 3** for the plan administration functions that Employer will perform for GHP as specified in GHP's Plan Document as amended and in **EXHIBIT 3**. Administrators may rely on Employer's certification and GHP's authorization that Employer has provided the requisite certification and will have no obligation to verify (1) that GHP's Plan Document has been amended to comply with the requirements of 45 C.F.R. § 164.504(f)(2), 45 C.F.R. § 164.314(b)(2), or this Section XI, or (2) that Employer is complying with GHP's Plan Document as amended.

### PART 4—MISCELLANEOUS

## XII.     AUTOMATIC AMENDMENT TO CONFORM TO APPLICABLE LAW

Upon the compliance date of any final regulation or amendment to final regulation with respect to Protected Health Information, Standard Transactions, the security of Health Information, or other aspects of HIPAA-AS applicable to this Addendum or to the Agreement, this Addendum will automatically amend such that the obligations imposed on Employer, GHP, and Administrators remain in compliance with such regulations, unless Administrators elects to terminate the Agreement by providing Employer and GHP notice of termination in accordance with the Agreement at least **90** days before the compliance date of such final regulation or amendment to final regulation.

## XIII.     CONFLICTS

The provisions of this Addendum will override and control any conflicting provision of the Agreement. All nonconflicting provisions of the Agreement will remain in full force and effect.

## XIV.     ADD GHP AS A PARTY TO AGREEMENT

Notwithstanding Section 3.1 of the Agreement, in order to make clear the respective HIPAA-AS compliance obligations of Administrators, GHP, and Employer, as set forth in this Addendum, GHP shall hereby be added as a separate party to the Agreement.

## XV.   REVISION TO SECTION 3.3

The first sentence of Section 3.3 of the Agreement shall be deleted and replaced as follows: "The Administrators shall provide claims processing services on behalf of the Group Health Plan."

## XVI.   REVISION TO SECTION 3.6

In order for GHP to be able to comply with its obligations under the HIPAA-AS Privacy and Security Rules and for Employer and Administrators to be able to comply with their obligations hereunder, the terms and conditions of Section 3.6 of the Agreement, and any subsequent amendments made thereto by the parties, shall be made subject to this Addendum.

## XVII.   REVISION TO SECTION 6.6

Section 6.6 of the Agreement shall be given effect except with respect to the subject matter of this Addendum, in which case Section XIII of this Addendum shall control.

## XVIII. COMPLIANCE DATE FOR SECURITY OBLIGATIONS

Administrators's security obligations as set forth in Sections III.F, III.H.2, and VII.B herein shall take effect the later of (A) the last date set forth in PART 5 below or (B) the compliance deadline of the HIPAA-AS Security Rule (which is, as of the date hereof, April 20, 2005 or April 20 2006 for Small Health Plans).

### PART 5—SIGNATURES

**ADMINISTRATOR:**

Blue Cross and Blue Shield of Florida, Inc.

By: _____

Title: __V P - Underwri_____

Date: __2\23\07_____

**ADMINISTRATOR:**

Health Options, Inc.

By: _____

Title: __V P - Underwri_____

Date: __2\23\07_____

**GROUP HEALTH PLAN:**

Brevard Public Schools Health Plan

By: _____

Title: _DIRECTOR, COMP. & BENEFITS_

Date: __2/20/07_____

**EMPLOYER:**

Brevard Public Schools

By: _____

Title: _DIRECTOR, COMP. & BENEFITS_

Date: __2/20/07_____

**EXHIBIT 1—SAMPLE NOTICE OF PRIVACY PRACTICES**

THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.

*Si usted desea una copia de esta notificación en español, por favor comuníquese con un representante de servicio al cliente utilizando el número telefónico indicado en su tarjeta de asegurado*

# Health Insurance Portability and Accountability Act-Administrative Simplification (HIPAA-AS)

## Notice of Privacy Practices

for your group health plan Sponsored by your employer and for which Blue Cross and Blue Shield of Florida, Health Options, Inc. and/or Florida Combined Life Insurance Company, Inc. provides claim administration and other services.

### Our Legal Duty

As your health plan, we are required by applicable federal and state laws to maintain the privacy of your protected health information (PHI). We want you to be aware of our privacy practices, our legal duties, and your rights concerning your PHI. We will follow the privacy practices that are described in this notice while it is in effect. This notice took effect **April 14, 2003**, and will remain in effect until a revised notice is issued.

We reserve the right to change our privacy practices and the terms of this notice at any time and to make the terms of our notice effective for all PHI that we maintain.

Before we make a significant change in our privacy practices, we will change this notice and send the new notice to you.

### How we can use or disclose PHI without a specific authorization

**To You:** We must disclose your PHI to you, as described in the Individual Rights section of this notice.

**For Treatment:** For example: we may disclose your PHI to a doctor, dentist or a hospital when requested, in order for the treating provider to provide treatment to you.

**For Payment:** For example: we may use and disclose PHI to pay claims for services provided to you by doctors, dentists or hospitals. We may also disclose your PHI to a health care provider or another health plan so that the provider or plan may obtain payment of a claim or engage in other payment activities.

**For Health Care Operations:** For example: we may use or disclose PHI to conduct quality assessment and improvement activities, to conduct fraud and abuse investigations, to engage in

-C12-

care coordination or case management or to communicate with you about health related benefits and services or about treatment alternatives that may be of interest to you. We may also disclose PHI to another health plan or a health care provider subject to federal privacy laws, as long as the plan provider has or had a relationship with you and the PHI is disclosed only for certain health care operations of that plan or provider.

**For Public Health and Safety:** We may use or disclose PHI to the extent necessary to avert a serious and imminent threat to the health or safety of you or others. We may also disclose PHI for public health and government health care oversight activities and to report suspected abuse, neglect or domestic violence to government authorities.

**As Required by Law:** We may use or disclose PHI when we are required to do so by law.

**For Process and Proceedings:** We may disclose PHI in response to a court or administrative order, subpoena, discovery request, or other lawful process.

**For Law Enforcement:** We may disclose PHI to a law enforcement official with regard to crime victims and criminal activities.

**Special Government Functions:** We may disclose the PHI of military personnel or inmates or other persons in lawful custody under certain circumstances. We may disclose PHI to authorized federal officials for lawful national security activities.

**To Plan Sponsors (including employers who act as Plan Sponsors):** We may disclose certain PHI to the Sponsor of your group health plan to perform plan administration functions. We may also disclose enrollment and disenrollment information, or summary health information to the Plan Sponsor so that the Plan Sponsor may:

- Obtain premium bids
- Decide whether to amend, modify or terminate your group health plan

**For Research, Death, and Organ Donation:** We may use or disclose PHI in certain circumstances related to research, death or organ donation.

**For Workers Compensation:** We may disclose PHI as permitted by workers' compensation and similar laws.

## Uses and Disclosures of PHI permitted only after Authorization received

**Authorization:** You may give us written authorization to use your PHI or to disclose it to anyone for any purpose not otherwise permitted or required by law. If you give us an authorization, you may revoke it in writing at any time. Your revocation will not affect any use or disclosure permitted by your authorization while it was in effect.

**To Family and Friends:** While the law permits us in certain circumstances to disclose your PHI to family, friends and others, we will do so only with your authorization. In the event you are unable to authorize such disclosure, but emergency or similar circumstances indicate that disclosure would be in your best interest, we may disclose your PHI to family, friends or others to the extent necessary to help with your health care coverage arrangements.

## Individual Rights

*To exercise any of these rights, please call the customer service number on your ID card.*

**Access:** With limited exceptions, you have the right to review in person, or obtain copies of your PHI. We reserve the right to impose reasonable fees associated with this access request as allowed by law.

**Amendment:** With limited exceptions, you have the right to request that we amend your PHI that we have on file.

**Disclosure Accounting:** You have the right to request and receive a list of certain disclosures made of your PHI. If you request this list more than once in a 12-month period, we may charge you a reasonable, cost-based fee to respond to any additional request.

**Use/Disclosure Restriction:** You have the right to request that we place certain additional restrictions on our use or disclosure of your PHI. We are not required to agree to a requested restriction.

**Confidential Communication:** You have the right to request that we communicate with you in confidence about your PHI at an alternative address. To receive confidential communications at an alternative address, please ask for a PHI address when you call the customer service number located on your ID card.

**Provider Services and Confidential Communications:** If you receive services from any health care providers, you are responsible for notifying those providers directly if you would like to request a PHI address from them.

**Privacy Notice:** You may request a copy of our notice at any time. For more information about our privacy practices, or for additional copies of or questions about this notice, please contact us using the information listed at the end of this notice.

## Organizations Covered by this Notice

**This Notice applies to the privacy practices of the organizations listed below:**

**Your group health plan sponsored by your employer and for which Blue Cross and Blue Shield of Florida, Health Options, Inc. or Florida Combined Life Insurance Company, Inc. provides claim administration and other services.**

## Complaints

If you are concerned that we may have violated your privacy rights, you may complain to us using the contact information listed at the end of this Notice. You also may submit a written complaint to the U.S. Department of Health and Human Services. We will provide you with the address to file your complaint with the U.S. Department of Health and Human Services upon request.

We support your right to protect the privacy of your PHI. We will not retaliate in any way if you choose to file a complaint with us or with the U.S. Department of Health and Human Services.

**Contact Office:** The Corporate Compliance Office of Blue Cross and Blue Shield of Florida, administrative service provider for your group health plan.

**Telephone:** 888-574-2583

**Address:** P.O. Box 44283, Jacksonville, FL 32203-4283

*Si usted desea una copia de esta notificación en español, por favor comuníquese con un representante de servicio al cliente utilizando el número telefónico indicado en su tarjeta de asegurado.*

## EXHIBIT 2—EMPLOYER'S CERTIFICATION

### PART 1 – Employer to Amend Plan Documents for Privacy provisions

Employer certifies that Employer has amended GHP's Plan Document to incorporate the provisions required by 45 C.F.R. § 164.504(f)(2), as set forth below, and agrees to comply with GHP's Plan Document as amended.

1.  Neither use nor further disclose Protected Health Information, except as permitted or required by GHP's Plan Document or as required by law.

2.  Neither use nor disclose Protected Health Information for any employment-related action or decision, or in connection with any other benefit or employee benefit plan of Employer.

3.  Ensure adequate separation between Employer and GHP by (a) describing those employees or classes of employees or other persons under Employer's control who will be given access to Protected Health Information to perform plan administration functions for GHP, (b) restricting the access to and use of Protected Health Information by such employees or other persons to the plan administration functions that Employer will perform for GHP, and (c) instituting an effective mechanism for resolving any noncompliance with GHP's Plan Document by such employees or other persons.

4.  Ensure that any subcontractor or agent to which Employer provides Protected Health Information agrees to the restrictions and conditions of GHP's Plan Document with respect to Protected Health Information.

5.  Report to GHP any use or disclosure of Protected Health Information of which Employer becomes aware that is inconsistent with the uses and disclosures allowed by GHP's Plan Document.

6.  Make Protected Health Information available to GHP or, at GHP's direction, to the Covered Person who is the subject of Protected Health Information (or the Covered Person's Personal Representative) so that GHP can meet its access obligations under 45 C.F.R. § 164.524.

7.  Make Protected Health Information available to GHP for amendment and, on notice from GHP, amend Protected Health Information, so that GHP can meet its amendment obligations under 45 C.F.R. § 164.526.

8.  Record Disclosure Information as defined above for each disclosure that Employer makes of Protected Health Information that is not excepted from disclosure accounting and provide that Disclosure Information to GHP on request so that GHP can meet its disclosure accounting obligations under 45 C.F.R. § 164.528.

9.  Make its internal practices, books, and records relating to its use and disclosure of Protected Health Information available to GHP and to DHHS to determine GHP's compliance with 45 C.F.R. Part 164, Subpart E "Privacy of Individually Identifiable Health Information."

10. Return to GHP or destroy if feasible all Protected Health Information in whatever form or medium that Employer (and any subcontractor or agent of Employer) received from GHP or Administrators, including all copies thereof and all data, compilations, and other works derived there from that allow identification of any present or past Covered Person who is the subject of

Protected Health Information, when Employer no longer needs Protected Health Information for the plan administration functions for which the Employer received Protected Health Information. Employer will limit the use or disclosure of any of Protected Health Information that Employer (or any subcontractor or agent of Employer) cannot feasibly return to GHP or destroy to the purposes that make its return to GHP or destruction infeasible.

### PART 2 - Employer to Amend Plan Documents for Security provisions

Employer further certifies that Employer has amended GHP's Plan Document to incorporate the provisions required by 45 C.F.R. § 164.314(b)(2), as set forth below, and agrees to comply with GHP's Plan Document as amended.

1.  Implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of Electronic Protected Health Information that Employer creates, receives, maintains or transmits on GHP's behalf.

2.  Ensure that the adequate separation between Employer and GHP required by 45 C.F.R. § 164.504(f)(2)(iii) (as described in item 3 above) is supported by reasonable and appropriate Security Measures.

3.  Ensure that any subcontractor or agent to which Employer provides Electronic Protected Health Information agrees to implement reasonable and appropriate Security Measures to protect the Electronic Protected Health Information.

4.  Report to GHP any incident of which Employer becomes aware that is (a) a successful unauthorized access, use or disclosure of Electronic Protected Health Information; or (b) a successful major (i) modification or destruction of Electronic Protected Health Information or (ii) interference with system operations in an Information System containing Electronic Protected Health Information. Upon GHP's request, Employer will report any incident of which Employer becomes aware that is a successful minor (a) modification or destruction of Electronic Protected Health Information or (b) interference with system operations in an Information System containing Electronic Protected Health Information.

## EXHIBIT 3— DISCLOSURE OF PROTECTED HEALTH INFORMATION
## FOR PLAN ADMINISTRATION

Group Health Plan ("GHP") must promptly notify Administrators in writing if any of the information contained in EXHIBIT 3 changes.

### PART 1

Name(s) and Title(s) of Employer representatives (i.e. employees of Employer) authorized to request and receive the minimum necessary Protected Health Information from Administrators:

| | |
|---|---|
| Susan Standley | Director, Compensation & Benefits |
| Lin Prisciandaro | Benefits Specialist |
| Debbie Lucas | Benefits Specialist |
| Lee Steele | Benefits Specialist |
| Karen Maltese | Accountant Auditor |
| Lana Saal | Wellness Manager |
| Lori Bock | Systems Analyst |

for the performance of the following plan administration functions for GHP unless otherwise indicated by GHP:

- Actuarial and statistical analysis
- Claims/membership inquiries
- Procurement of reinsurance or stop loss coverage
- Quality assessment and improvement activities
- Performance monitoring
- Other health care operations
- Payment activities

### PART 2

Identify the name(s), title(s) and company name(s) of any individual(s) from organizations other than Employer or Group Health Plan ("GHP") (examples of such "GHP Vendor" types of services include, but are not limited to, stop-loss carriers; reinsurers; agents, brokers or consultants; or external auditors) that Employer or GHP hereby authorizes to request and receive the minimum necessary Protected Health Information to perform plan administration functions and/or assist with the procurement of reinsurance or stop-loss coverage:

| Company Name | Type of Service Performed (Example: stop-loss carrier; reinsurer; agent, broker) | Name of Individual Performing Service | Title of Individual Performing Service |
|---|---|---|---|
| RobinsonBush | Consultant | John Robinson | President, CEO |
| RobinsonBush | Consultant | Jan Bush | Sr. Vice President, COO |
| RobinsonBush | Consultant | Jeanne Brooks | Client Service Manager |
| RobinsonBush | Consultant | David Parker | Actuary |
| RobinsonBush | Consultant | Shawntae Hardy | Health Management Consultant |
| Crowne Consulting | Stop-Loss Agent | Mackie Branham | CEO |
| Crowne Consulting | Stop-Loss Agent | Ray Tomlinson | President |
| Crowne Consulting | Stop-Loss Agent | Roxane Welch | Account Manager |
| Crowne Consulting | Stop-Loss Agent | Tina Wittman | Account Manager |

-C18-

| Symetra | Reinsurer | Mary Hewitt | Senior Group Sales Associate |
|---------|-----------|-------------|------------------------------|
| Symetra | Reinsurer | Murphy Head | Regional Group Manager |
| FBMC Benefits | Enrollment Company TPA | Bernie Smith | Account Executive |
| FBMC Benefits | Enrollment Company TPA | Connie Casto | Benefits Continuation Manager |
| FBMC Benefits | Enrollment Company TPA | Sonia Georges | Sr. Benefits Rep |
| FBMC Benefits | Enrollment Company TPA | Tricia Wilbur | Sr. Management Analyst |
| FBMC Benefits | Enrollment Company TPA | Scott Greet | Benefits Continuation Analyst |
| Easy Benefits | Enrollment Company TPA | Josh Letterman | Systems Analyst |
| Easy Benefits | Enrollment Company TPA | Eric London | Systems Analyst |

## EXHIBIT "D"

### to the
### ADMINISTRATIVE SERVICES AGREEMENT
### between
### BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.
### and
### HEALTH OPTIONS, INC.
### and
### BREVARD PUBLIC SCHOOLS

## CONFIDENTIALITY AND INDEMNITY AGREEMENT

This Agreement, effective January 1, 2007 is entered into between Blue Cross and Blue Shield of Florida, Inc. (hereinafter "Administrator"), Health Options, Inc. (hereinafter "Administrator") and Brevard Public Schools (hereinafter "Employer"), RobinsonBush (hereinafter "Consultant") and Symetra Life Insurance Company (hereinafter "Reinsurer") and The Crowne Group (hereinafter "Stoploss Broker").

WHEREAS, Employer has established and maintains a self-insured Employee Welfare Benefit Plan pursuant to the Employee Retirement Income Security Act of 1974 to provide certain benefits as its Group Health Plan (hereinafter "Plan") for covered group members and their covered dependents; and

WHEREAS, Administrators and Employer have entered into an agreement for the administration of the Group Health Plan (hereinafter "Administrative Services Agreement"); and

WHEREAS, Employer has directed Administrators to provide Consultant, Stoploss Broker and/or Reinsurer access to certain Confidential Information (hereinafter defined) for cases which meet the criteria set forth in attached Exhibit 1, which Employer has determined is necessary for Consultant, Stoploss Broker and/or Reinsurer to perform the certain services for the Employer; and

WHEREAS, Administrators desires to safeguard the confidentiality of the medical claims and other information acquired with regard to the covered group members and their covered dependents and to safeguard information regarding Administrators's policies and procedures which are regarded as confidential and proprietary; and

WHEREAS, Employer, Consultant, Stoploss Broker and Reinsurer recognize the legitimate interests of Administrators and the individuals whose health benefits are administered by Administrators in the proprietary, confidential, and private nature of such Confidential Information, and Administrators is willing to provide the Confidential Information only if its use is restricted to the purpose for which it is released and its confidentiality is maintained;

NOW, THEREFORE, for good and valuable consideration, the parties hereby agree as follows:

1. For the purposes of this Agreement, "Confidential Information" means the information listed below in this Paragraph 1, any information that Consultant, Stoploss Broker and/or Reinsurer learns or becomes aware of, directly or indirectly, through the disclosure of Confidential Information, and any and all summaries, distillations, excerpts, work product or other documents utilizing or incorporating same, whether in whole or in part.

   – Medical claim record information concerning individuals covered under the Plan,

   – Administrators's provider contract information, e.g., allowances, fee schedules, etc., and

   – any other information designated in writing by Administrators as confidential, trade secret, or proprietary.

2. Consultant, Stoploss Broker and/or Reinsurer shall only request, use and disclose the minimum amount of Confidential Information necessary for Consultant, Stoploss Broker and/or Reinsurer to perform the services for Employer.

3. Confidential Information shall not include information that (i) is already known to Consultant, Stoploss Broker and/or Reinsurer on effective date of this Agreement; (ii) is or becomes known to the general public other than as a direct or indirect result of any act or omission of Employer, Consultant, Stoploss Broker, Reinsurer, or the affiliates, officers, directors, partners, employees, or agents (collectively, the "Related Parties") of Employer, Consultant, Stoploss Broker or Reinsurer; (iii) is lawfully received by Consultant, Stoploss Broker and/or Reinsurer from a third party that Consultant, Stoploss Broker and/or Reinsurer has verified is free to disclose the information without restriction on disclosure; or (iv) is independently developed by Consultant, Stoploss Broker and/or Reinsurer without use of Confidential Information.

4. Subject to applicable laws, Administrators will release to Consultant, Stoploss Broker and/or Reinsurer certain Confidential Information for purposes of: 1) monitoring designated cases for which reinsurance coverage may be available to Employer; and/or 2) auditing claims payments made by Administrators; provided that Employer is in compliance with all other terms and conditions of this Agreement and the Administrative Services Agreement, and Consultant, Stoploss Broker and Reinsurer are in compliance with all other terms and conditions of this Agreement.

5. Consultant, Stoploss Broker and Reinsurer each acknowledge that Administrators will provide Confidential Information to Consultant, Stoploss Broker and/or Reinsurer in confidence and solely for Consultant's, Stoploss Broker's and/or Reinsurer's use in performing the services for Employer. Accordingly, Consultant, Stoploss Broker and Reinsurer each agree (i) to protect any and all Confidential Information Consultant, Stoploss Broker or Reinsurer receives from unauthorized access, use and disclosure; (ii) not to use the Confidential Information for any purpose other than performing the services for Employer; (iii) not to record, copy, or reproduce any Confidential Information in any form, except to the extent necessary to perform the services for Employer; (iv) not to disclose the Confidential Information to, or otherwise permit to access the Confidential

Information, any third party, including without limitation Consultant's, Stoploss Broker's or Reinsurer's Related Parties, except as expressly provided herein or with Administrators's prior written consent; (v) to limit access to and use of the Confidential Information to those of Consultant's, Stoploss Broker's or Reinsurer's employees who have a need to know such information for the purpose of performing the services and have acknowledged, in a writing which will be made available to Administrators upon request, their individual agreement to the terms hereof; and (vi) to take any and all other steps necessary to safeguard Confidential Information against unauthorized access, use, and disclosure to at least the extent Consultant, Stoploss Broker or Reinsurer maintains the confidentiality of its most proprietary and confidential information.

6. Consultant, Stoploss Broker and/or Reinsurer shall ensure that its agents, contractors and vendors to whom it discloses Confidential Information agree to abide by those provisions within this Agreement that govern the use, disclosure, and protection of all Confidential Information obtained from Administrators. This provision shall not be construed to permit any delegation or assignment of Consultant's, Stoploss Broker's or Reinsurer's obligations otherwise prohibited by this Agreement.

7. Consultant, Stoploss Broker and/or Reinsurer shall promptly report in writing to Administrators any use or disclosure of Confidential Information not provided for under this Agreement, of which Consultant, Stoploss Broker and/or Reinsurer becomes aware, but in no event later than within five business days of first learning of any such use or disclosure. Consultant, Stoploss Broker and/or Reinsurer shall mitigate, to the extent practicable, any harmful effect that is known to Consultant, Stoploss Broker and/or Reinsurer of a use or disclosure of Confidential Information by Consultant, Stoploss Broker and/or Reinsurer in violation of this Agreement.

8. Consultant, Stoploss Broker and/or Reinsurer may disclose Confidential Information if required to do so under any federal, state, or local law, statute, rule or regulation; provided, however, that (i) Consultant, Stoploss Broker and/or Reinsurer will provide Administrators with immediate written notice of any request that Consultant, Stoploss Broker and/or Reinsurer disclose Confidential Information, so that Administrators may object to the request and/or seek an appropriate protective order or, if such notice is prohibited by law, Consultant, Stoploss Broker and/or Reinsurer shall disclose the minimum amount of Confidential Information required to be disclosed under the applicable legal mandate; and (ii) in no event shall Consultant, Stoploss Broker and/or Reinsurer disclose Confidential Information to a party other than a government agency except under a valid order from a court having jurisdiction requiring the specific disclosure.

9. By disclosing Confidential Information to Consultant, Stoploss Broker and/or Reinsurer under this Agreement (including but not limited to information incorporated in computer software or held in electronic storage media), Administrators grants Consultant, Stoploss Broker and/or Reinsurer no ownership right or interest in the Confidential Information. When Consultant, Stoploss Broker and/or Reinsurer no longer need Confidential Information for the purpose for which it was disclosed but no later than the expiration or termination of this Agreement, Consultant, Stoploss Broker and/or Reinsurer shall collect and return to Administrators or destroy all Confidential Information received from or on behalf of Administrators that Consultant, Stoploss Broker and/or Reinsurer has in its control or custody in any form and shall retain no copies of such information. Consultant,

Stoploss Broker and/or Reinsurer shall complete these obligations as promptly as possible. Upon request, an authorized officer of Consultant, Stoploss Broker and/or Reinsurer shall certify on oath to Administrators that all Confidential Information has been returned or destroyed and deliver such certification to Administrators within ten (10) business days of its request. If return or destruction of any Confidential Information is not feasible, Consultant, Stoploss Broker and/or Reinsurer shall limit further uses and disclosures of such Confidential Information to those purposes making return or destruction infeasible and continue to apply the protections of this Agreement to such Confidential Information for so long as Consultant, Stoploss Broker and/or Reinsurer retains such Confidential Information. Consultant, Stoploss Broker and/or Reinsurer may, subject to its continued adherence to its obligations of confidentiality as defined in this Agreement, retain one copy of documents containing Confidential Information to defend its work product and to comply with applicable insurance record-keeping laws and regulations.

10. In the event that Consultant, Stoploss Broker and/or Reinsurer perform any of the services on Administrators's premises, Consultant, Stoploss Broker and/or Reinsurer agree not to remove from Administrators's premises any Confidential Information that is provided to or obtained by the Consultant, Stoploss Broker and/or Reinsurer on such premises, without the prior written consent of Administrators.

11. In any report or transmittal to Employer by Consultant, Stoploss Broker and/or Reinsurer that contains or pertains to oral or written Confidential Information, no medical information or dates of service will be identifiably attributed to any particular employee, dependent, or provider. Furthermore, any such report or transmittal shall not contain any information designated by Administrators as confidential, trade secret, or proprietary.

12. As the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA-AS) and certain of its implementing regulations (HIPAA-AS Regulations) are now effective, Employer, Consultant, Stoploss Broker and Reinsurer agree to institute any additional procedures and/or agreements required to ensure the parties' compliance with that law and those regulations. Employer represents and warrants that Employer (i) has amended each Plan's plan document to permit Employer to perform plan administration for the Plans (including the activity(ies) described in the recital clauses above) in accordance with 45 C.F.R. § 164.504(f) and 45 C.F.R. § 164.314(b) of the HIPAA-AS Regulations ("HIPAA Amendment"); (ii) has delivered to each Plan and Administrators a written statement, certifying its amendment of the Plan's plan document as required by the HIPAA-AS Regulations and its agreement to comply with that amendment; and (iii) has obtained each Plan's permission to receive individually identifiable health information from Administrators for the purposes and subject to the restrictions and protections described in the HIPAA Amendment. Consultant, Stoploss Broker and Reinsurer each agree to be bound, and to cause any agent or subcontractor to be bound, by the same restrictions and protections agreed to by Employer in the HIPAA Amendment with respect to any individually identifiable health information encompassed within the Confidential Information Consultant, Stoploss Broker and/or Reinsurer receives.

13. No health insurance records or information, or claims information, shall be disclosed without the prior written authorization of the individual whose records or information would be disclosed; provided, however, that Consultant, Stoploss Broker and Reinsurer may release information provided pursuant to this Agreement to subsidiaries of

Consultant, Stoploss Broker and Reinsurer so long as any and all such subsidiaries agree to abide by all terms and conditions of this Agreement.

14. Employer, Consultant, Stoploss Broker and Reinsurer shall comply with all applicable federal, state or local laws, rules, or regulations or any other order of any authorized court, agency, or regulatory commission, and all applicable professional standards and practices, concerning the handling and/or safekeeping of information and/or other records of the nature disclosed by Administrators hereunder and shall use such information only for proper and lawful purposes.

15. Employer, Consultant, Stoploss Broker and Reinsurer shall comply with all state and federal laws regulating the disclosure of patient records or private and medically sensitive information released pursuant to this Agreement, including without limitation, alcohol and drug abuse patient records, information relating to treatment of alcohol or drug dependency, HIV testing results, and psychological or psychiatric evaluation.

16. Consultant agrees to indemnify, defend, and hold Administrators and Administrators's Related Parties harmless from any actual or threatened legal or administrative action, claim, liability, penalty, fine, assessment, lawsuit, litigation, or other loss, expense, or damage, including without limitation reasonable attorneys' fees and costs (collectively, "Liability"), that Administrators or Administrators's Related Parties may incur arising out of or in connection with any actual or alleged breach by Consultant or any of Consultant's Related Parties of any applicable law, regulation, or other legal mandate or any provision of this Agreement.

17. Stoploss Broker agrees to indemnify, defend, and hold Administrators and Administrators's Related Parties harmless from any actual or threatened legal or administrative action, claim, liability, penalty, fine, assessment, lawsuit, litigation, or other loss, expense, or damage, including without limitation reasonable attorneys' fees and costs (collectively, "Liability"), that Administrators or Administrators's Related Parties may incur arising out of or in connection with any actual or alleged breach by Stoploss Broker or any of Stoploss Broker's Related Parties of any applicable law, regulation, or other legal mandate or any provision of this Agreement.

18. Reinsurer agrees to indemnify, defend, and hold Administrators and Administrators's Related Parties harmless from any actual or threatened legal or administrative action, claim, liability, penalty, fine, assessment, lawsuit, litigation, or other loss, expense, or damage, including without limitation reasonable attorneys' fees and costs (collectively, "Liability"), that Administrators or Administrators's Related Parties may incur arising out of or in connection with any actual breach by Reinsurer or any of Reinsurer's Related Parties of any applicable law, regulation, or other legal mandate or any provision of this Agreement.

19. Employer, Consultant, Stoploss Broker and Reinsurer acknowledge and agree that Administrators operates in a highly regulated and competitive environment and that the unauthorized use or disclosure of Confidential Information will cause irreparable harm and significant injury to Administrators, which will be difficult to measure with certainty or to compensate through money damages. Accordingly, Administrators shall be entitled to seek injunctive or other equitable relief, without bond, and/or specific performance as a remedy for any breach of this Agreement. Such remedy shall not be deemed to be the

exclusive remedy for a breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

20. It is understood and agreed that no failure or delay by Administrators in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

21. Upon occurrence of any of the following, this Agreement shall terminate without notice, unless notice is specifically required:

   a. Termination of the Administrative Services Agreement.

   b. If Administrators determines at its own discretion that the Confidential Information released pursuant to this Agreement is not being adequately protected by either Employer, Consultant, Stoploss Broker or Reinsurer for confidentiality purposes.

   c. Upon fifteen (15) days notice to Employer, Consultant, Stoploss Broker or Reinsurer, as appropriate. Such notice shall be given without need for cause.

   d. Upon any attempt by Employer, Consultant, Stoploss Broker or Reinsurer (which attempts shall be null and void) to assign this Agreement or the right to receive information, without the prior express consent of Administrators.

   e. Upon enactment of or the effective date of, whichever first occurs, any applicable state or federal law or any rule or regulation of any agency having applicable jurisdiction, which law, rule or regulation shall prohibit (in part or in full) Administrators from fulfilling its obligations hereunder. No penalty, liability or damage shall be applicable or claimed by Employer, Consultant, Stoploss Broker or Reinsurer against Administrators in such event.

22. The relationship between the parties is that of independent contractors. Nothing in this Agreement shall be construed to create a partnership or joint venture between the parties and neither party shall have the right to bind the other to any contracts, agreements, or other obligations without the express, written consent of an authorized representative of the other.

23. This Agreement shall be governed and construed by the laws of the State of Florida (irrespective of its choice of law principles). It constitutes the entire Agreement between the parties in reference to all matters expressed in the Agreement. All previous discussions, promises, representations, and understandings between the parties pertaining thereto, if any, being merged herein.

24. This Agreement may not be assigned, nor any obligations delegated, by Employer, Consultant, Stoploss Broker and/or Reinsurer, without the prior written consent of Administrators, and any such non-permitted assignment or delegation shall be void.

25. In the event any provision of this Agreement is rendered invalid or unenforceable by any valid act of Congress or the Florida Legislature or by any regulation duly promulgated by the officers of the United States or the State of Florida acting in accordance with law, or if

declared null and void by any court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect.

26. Waiver of breach of any provision of this Agreement shall not be deemed a waiver of any other breach of the same or a different provision.

27. The obligation of Employer, Consultant, Stoploss Broker and/or Reinsurer to protect the privacy of Confidential Information as specified in this Agreement shall be continuous and survive the expiration or termination of this Agreement. In addition, the rights and obligations of the parties set forth in Sections 9, 11, 16 - 19 and of this paragraph 27 of this Agreement shall survive its expiration or termination.

28. This Agreement may be amended by mutual agreement of the parties, but no such amendment shall become effective until it is reduced to writing and signed by duly authorized representatives of each party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representative as set forth below.

EMPLOYER
BREVARD PUBLIC SCHOOLS

By: _____
Title: DIRECTOR, COMP. & BENEFITS
Date: 2/20/07

ADMINISTRATOR
BLUE CROSS AND BLUE SHIELD
OF FLORIDA, INC.

By: _____
Title: VP - Underwri
Date: 2/23/07

ADMINISTRATOR
HEALTH OPTIONS, INC.

By: _____
Title: VP - Underwri
Date: 2/23/07

REINSURER
SYMETRA LIFE INSURANCE COMPANY

By: _____
Title: General Agent
Date: 2/22/2007

CONSULTANT
ROBINSONBUSH

By: _____
Title: Sr VP / COO
Date: 2/21/07

STOPLOSS BROKER
THE CROWNE GROUP

By: _____
Title: President
Date: 2/22/2007

-D7-

**EXHIBIT 1**

Administrators shall release confidential information to Consultant, Stoploss Broker and/or Reinsurer for cases which meet the following criteria: